French vs. The State.

FRENCH, Plaintiff in error, vs. THE STATE, Defendant in error.

*March 14 — May 22, 1896.*

CRIMINAL LAW AND PRACTICE. (1) *Change of venue for prejudice of judge: Conditional application.* (2) *Inquisition as to sanity: Constitutional law.* (3) *Assistant prosecutor: Impartiality.* (4–8) *Plea of insanity: Practice: Evidence.*

1. Under sec. 4686a, S. & B. Ann. Stats., when a change of venue is applied for in a criminal case on account of the prejudice of the judge, it is a matter within the discretion of the court whether it will award the change or call in another judge to try the action; and the defendant cannot couple with such application a condition that the case shall not be sent out of the county. The filing of an affidavit of prejudice, therefore, if coupled with such a condition, does not deprive the court of jurisdiction to proceed with the trial.

2. Sec. 4700, R. S., providing for an inquisition to determine whether the defendant is, at the time of the trial, insane and therefore incompetent to act for himself, is in aid, and not in derogation, of the constitutional provision (art. I, sec. 7) securing to him a fair and impartial trial.

3. No attorney should be permitted or selected to assist in the prosecution of a criminal case unless he is as unprejudiced and impartial as the prosecutor provided by law.

4. Sec. 4697, S. & B. Ann. Stats. (providing that if the jury fail to agree on the special issue of insanity the court shall proceed forthwith to trial on the main issue, and the question of insanity involved in the special issue shall be tried and determined with the plea of not guilty), is valid. *Bennett v. State,* 57 Wis. 69, followed.

5. Upon the trial of the plea of not guilty in such case the defendant cannot admit the homicide in order to obtain the affirmative of the issue as to his insanity and thus obtain the right to open and close the case.

6. Upon the question of the insanity of a defendant charged with murder, evidence of his acts, conduct, and declarations after the homicide is admissible, and the period of inquiry should be sufficiently extended to include such acts, conduct, and declarations so far as they relate to, are connected with, or grow out of, or illustrate, or afford material evidence of, his mental condition at

French vs. The State.

the time of the homicide.  In this case a limitation of the inquiry to four days after the homicide is *held* to have been unreasonable and to have deprived the defendant of the right to produce relevant evidence which might show that, after a reasonable time had elapsed for his return to his normal condition, his mental condition and situation remained unchanged, and that they were not, at the time of the homicide, as claimed by the prosecution, the result of protracted intoxication, producing a fit of drunken excitement and fury.

7.  Testimony in behalf of the defendant in such case, directed to the question of his insanity at the time of the homicide, should not be excluded merely because, although relevant, it would be cumulative.

8.  It was improper in such a case to receive expert testimony to the effect that, although a man suffering from delirium tremens has no more control over his actions than a man suffering from delirium produced by any other cause, he is nevertheless sane.

ERROR to review a judgment of the circuit court for Ashland county: JOHN K. PARISH, Circuit Judge.  *Reversed.*

A former conviction of the plaintiff in error for the murder of Gavin M. Steele was reversed, and a new trial granted. 85 Wis. 400.  The case came on for another trial, when an affidavit of the defendant was filed that the circuit judge was prejudiced, and a motion was made for a change of venue to Chippewa county, which was granted, but the order was subsequently vacated by consent.  The court required the defendant to elect whether he would withdraw the affidavit of prejudice which had been filed, or whether he would move thereon for a change of venue.  The defendant's counsel then withdrew the affidavit, without prejudice to his right to file another before the trial commenced. Subsequently the defendant moved to refile the affidavit, and renewed the motion for a change of venue, on condition that the court should not send the case out of the county, and that unless the court called in another judge to try the case the defendant withdrew his affidavit and motion.  The court held that the motion must be made in

the usual form and unconditionally, and overruled the motion as thus made.

The district attorney filed an information that there was a probability that the defendant was then insane, and suggesting that an inquisition be made as to his sanity. The defendant's counsel objected on the ground that the defense of insanity would be made, and that sec. 4700, R. S., providing for such inquisition, was in conflict with sec. 7, art. I, Const. of Wis., and void, and demanded that the trial proceed on the issues already formed. The objections and demand were overruled. The jury, upon such inquisition, found the defendant sane enough at that time to stand his trial. A special plea of insanity at the time of the commission of the alleged offense was interposed, upon which issue was taken.

The defendant filed his affidavit alleging that W. F. Shea, proposed as assistant prosecutor, for various reasons was not a proper person to act as such, and considerable evidence was adduced upon this point; the court holding that, as he was not retained by any private person in this case or any other founded on the same facts, and as he was otherwise competent, the objections were not well taken.

A trial was then had upon the issue of insanity, and the jury failed to agree and were discharged. Another jury was then impaneled to try the defendant on the general plea of not guilty, and the question of the defendant's sanity, as involved therein, as required by the statute (S. & B. Ann. Stats. sec. 4697). The defendant's counsel asked that the court proceed to another trial on the special plea, but this request was denied. The defendant's counsel then moved to admit the homicide, and to allege in defense that the defendant was insane at the time, but upon the express condition that such admission should give him the affirmative of the case; but the district attorney refused to accept the proposition, and the court held that the state would take the burden of proof and proceed in the usual way.

The circumstances of the killing, which took place March 5, 1891, in the drug store of the deceased, as shown on the part of the state, were, that *French* came in and made a demand of Steele for some money the latter had for safe-keeping, which he repeated; Steele asking Mrs. French, who was present, if he should give *French* the money. She said, "No, no, *Will;* you don't need it." *French* said to Steele, " G——d d——n you! I will make you give it to me." Steele said, " You know that you can't make me give it to you." *French* then drew a revolver from his pocket, and said, "Steele, G——d d——n you! die!" and shot him. He shot at Steele three times. They were face to face, about eight or ten feet apart. Steele died almost instantly. About a minute after, *French* came and looked at him, and said "Poor Gavin! The best friend I or my family ever had!" Others testified to the same statement. There were several witnesses to the killing. Two testified that *French* said, after the shooting, "He has always been a traitor in our family." The witnesses said that *French* seemed excited, angry; some of them, that they thought he was under the influence of liquor,— his eyes looked bright, inflamed. They all thought him sane, from what they knew and saw of him.

The evidence tended to show that *French* had been given to excessive drinking, and Steele and others had put up powders to relieve him; that he insisted on having morphine powders, and they gave him quinine instead. Dr. Reinhart testified to seeing *French* on the day of the homicide, and in the afternoon at the jail; that up to the time of the homicide he saw nothing that would cause him to believe him insane. At the jail his actions were not those of a man in his right mind. He was very much excited and nervous; wanted bromide to quiet him. He went on talking about the trouble in a rather incoherent and excitable manner. He said he was right in the matter; that God had directed him. Mentioned certain little improprieties that were going on in his family, and he thought Steele was assisting persons

to carry them out. His conversation was such as you might expect from a man not mentally sound. His appearance and actions were not those of a man in his right senses, but there was an excitement which would cover up the ordinary symptoms of insanity. Very considerable evidence was given on the part of the state, by nonexperts, tending to show that in their opinion the defendant was sane at the time previous to the homicide when they conversed with him. The cashier of the Northern National Bank testified to his calling on him on the morning in question to get a loan of money; had various deals with him; judged he was under the influence of liquor, but thought he was sane. Louise Doucette testified that she was working at the defendant's house the day Steele was shot; that the defendant came home at 11 o'clock in the forenoon; wanted a cup of coffee; said he was going up to Steele's, and if Steele did not give him his money he would shoot him. Steele was taking his meals at defendant's house at the time. A Mr. Duket had been boarding there up to within about three weeks. That the defendant had been often under the influence of liquor, particularly just before the shooting. On cross-examination she testified that when he came to the house that day he looked wild, his eyes were glassy, and he looked pale, and was trembling. He said, "The devil has always been before me, and now he has got to get behind me." Two days before he said, "Louise, things have been getting pretty serious at the house for some time," and she told him "Yes." Asked if she saw Duket stroke Mrs. French's face, and she told him "Yes." He talked about powders being put in his coffee, that made him sick. This was before he went to Marengo. Two hypothetical questions, of considerable length, founded on the evidence as claimed by the prosecution, were propounded to an expert witness of extensive experience, who testified that he did not see in the facts embraced in them any evidence which indi-

cated to his mind that the defendant was insane; that in his opinion the defendant was sane.

On the part of the defense, considerable evidence was given tending to show insanity on the part of the defendant before and when the homicide occurred. One Rea, his brother-in-law, testified that he came to his house in the afternoon (four days before the homicide). Was very much excited, and seemed in great trouble. He burst out crying, then he would curse a while, and would pray a while. Said he had great trouble in his family; there were parties trying to ruin his home. ' He was very much excited, and looked dangerous. His eyes were glassy looking, and he trembled and seemed very nervous. He said Gavin M. Steele and Duket were trying to ruin his home, and he spoke incoherently. The burden of his song was that Steele and Duket were trying to conspire against him, to ruin his home and family. Said he had been shot at, and the ball passed over his shoulder, when he was on the way to the camp at Marengo. He remained at the house of witness during the night, and until 8 or 9 o'clock the next morning. Saw him quite often during the night, and there was no change in his condition, the strain of his conversation being that Steele and Duket were trying to wreck his home. There was nothing to indicate that he was in a state of intoxication, or that he had been drinking. Thought he was insane, but knew he had been periodically addicted to the use of liquors for years. He did not undress, but his father laid down on the bed beside him, and his sister also stayed with him. Mrs. Rea's evidence was to the same effect, and that the defendant said Steele had given a dirk knife to Nugent to kill him, and his life was in danger; that they were conspiring to kill him, and he could not turn around but he met these things face to face; that powders had been given by his wife, or Steele, to curse or kill him. He raved all night,— all about his family troubles,— his wife; his children were homeless,

and Duket was trying to take his place; that his home was wrecked and ruined, and his peace of mind gone. She thought he was insane. He got up in the night to take his revolver from her, and put it back in his coat pocket, and said, "Leave it alone," and he watched it all night,— kept his eye on it. He got up a second time to see if the detectives were watching his house. He had two of them watching his house. He said he had hired them to watch Duket, and see that he did not enter his home. The defendant's father gave similar evidence, and that Duket frequently went to see Mrs. French, and was very attentive to her, while the defendant was absent at his camp; that she and Duket were sitting up from 2 to 4 o'clock in the morning; that he remonstrated with her, but to no effect, and tried to get Steele to assist him, but he told them, "Sit up as long as you like, but get up in the morning;" that he told defendant about it, and defendant warned Duket not to have anything to do or say to his wife, and not to speak to her if he met her on the street. Duket answered, "Why ask me to do a thing I can't help doing?" Finally defendant, in February, ordered Duket out of his house, and took a gun, in order to shoot him, as he supposed, but witness got it from him. That he thought the defendant insane. The night before the shooting the defendant slept at some boarding house. In the morning he told witness that he was going to demand that money of Steele, about $500, that he had turned over to his wife for safe-keeping. He had been addicted to the use of liquors for years, and on some occasions drank to excess.

William Seeger, employed at the defendant's lumber camp, and who came from there with him, March 1st, to the house of Rea, his brother-in-law, testified to the effect that February 24th, at the camp, defendant desired witness to arrest parties who had, he said, been shooting at him, and pointed out a stump as one who had shot at him. His eyes looked wild, and stuck out large, and he was very blue in the face.

French vs. The State.

That night, after he had laid down, he jumped up and went to the window, and said he could see the one who was going to shoot him. It was only a tree. He required blankets to be nailed up at the windows, so no one could look through. About the middle of the night, heard him out doors, and he came in pretty near frozen to death. He said there was a conspiracy to use him up and get rid of him; that Duket and Steele were in the conspiracy. He went out of the camp that morning, and returned towards evening. He said: "I have got now to the bottom of all my troubles. Steele is at the head of everything." He looked kind of queer and wild. Went with him to Ashland, March 1st, and he returned to camp again. The day before the shooting, witness and one Nugent went with him to Ashland. Saw him at 11 o'clock the next day at the Colby House. He was to return to the camp after dinner. All at once he jumped up and left witness. His eyes looked very dim and wild,— blurred-like. Witness thought him insane. Other witnesses testified in substance the same as to what occurred at the camp. One Armstrong testified to meeting the defendant on the sidewalk on the morning of the homicide. That he tapped witness on the shoulder, and said, "Ben, they are trying to do me up." That he had quite a wild look, and, from the look of his eyes, he did not care to remain in his company. That they walked along a little way, and he asked witness to take a drink with him, and witness said to him: "You have had enough. You had better go on down home." Thought he was bordering on delirium tremens, or was coming out of it,— something of the kind. Had thought many times he was not in his right mind, and was still of the same opinion.

Robert Patrick saw defendant, on the day of the homicide, between 10 and half-past 11, at the Colby House. He grabbed witness by the hand, and said, "How do you do?" He was a little wild, and said: "I am having trouble. I opened my doors, my home, to him, and made a friend of

him, and they are trying to rob me out of my money and my home." He was talking a little loud; turned to the left, and went to talking to his father. He looked wild, his eyes were bright and glassy, and "I saw at once he was off his base a little. He was pale, and think he was insane." Several other witnesses testified to the same or similar declarations and conduct of the defendant shortly preceding the day of the shooting.

Robert McDonald, prison guard at the Ashland jail, testified to seeing the defendant the first day he was brought to the jail; that he looked wild and excited, and talked and raved a good deal about his family trials and troubles, snakes and vipers, and such talk as that,— about a conspiracy to injure his home and rob him of his wife and property. Spoke of it as if it had been going on for a long time. Mentioned Duket's name in it, and the name of Mr. Steele in the conspiracy. The next day he wanted to go down town, and persisted in it. He was excited, wild, kind of crazy, sometimes. Sometimes he was quite sensible. On the following day there were some spells that he seemed to be sane. When something was said in regard to his troubles or family affairs, he seemed to become insane. On the fourth day there was no material change, as compared with the third day. Defendant's counsel asked, "How was he on the following day?" This was objected to as incompetent, irrelevant, and immaterial, and too remote in time. The objection was sustained, the court stating, in substance, that the defendant's counsel would be precluded from showing his condition on the fifth day; adding, "I am willing for you to show his appearance about that time, without there is some radical change." Witness saw defendant daily from the time he was committed to jail, March 5, 1891, to the time he was taken away after the trial, the latter part of May, or the early part of June, 1891. He was asked by defendant's counsel to describe his appearance and conduct

French vs. The State.

during that period. This was objected to, and the objection was sustained. The defendant's counsel then offered to prove by the witness that he saw the defendant daily from March 5, 1891, until the beginning of his trial, in May of that year, and from then until he was taken to the state prison, about the middle of June, 1891; that the appearance and conduct of the defendant during all that time was the same as it was on the day of the homicide and the days succeeding, concerning which the witness had testified; that his eyes had the same appearance, and his conduct and talk were of the same character, in reference to the same subject. The court stated that it did not think there was anything in this, new; that it could see no reason why it should be admitted, as it was merely cumulative.

Clarence Snyder, the president of the state board of control, testified that the board meets at the state prison four times a year; that he saw the defendant a number of times between July 1, 1891, and June, 1893, and he appeared before the board at times. At the suggestion of the court, and with the assent of the district attorney, the defendant's counsel offered to prove by the witness that the defendant appeared before the board to present to it reasons why he should be given his liberty, and that on several occasions of the kind the defendant deported himself in a manner that convinced the witness that he was insane; that his appearance, the brightness of his eyes, the pallor of his face, trembling of his person, and his excitable manner and methods of presenting his case, contributed to that belief; that, in support of what he termed his constitutional rights, he presented a Bible and a Blue Book of Wisconsin; that on one occasion when allowed to present his case he presented a disjointed harangue and discussed his belief in the existence of a conspiracy, of which Steele and Duket were members, to break up his home and destroy his family; that he became so violent on one occasion, in presenting

his case, about April 1, 1893, that he had to be forcibly carried from the presence of the board by the officers of the prison; and that, at the times mentioned, witness believed the defendant was insane. Objection being made, the court excluded the offered evidence. The defendant's counsel made the same offer, somewhat more in detail, to prove the same matters by Mr. Jones, another member of the board, and also by Mr. Brown, the prison chaplain. These offers were also rejected. A medical expert of extensive experience testified, in answer to a lengthy hypothetical question, that he should say that on the day of the homicide the defendant was insane.

The defendant was found guilty of murder in the second degree, and having been sentenced accordingly he brought this writ of error.

*E. J. Dockery*, for the plaintiff in error.

For the defendant in error there was a brief by *R. Sleight* and the *Attorney General*, and oral argument by *Mr. Sleight* and *John L. Erdall*, Assistant Attorney General.

PINNEY, J. 1. The right to a change of venue depends entirely upon the statute. It is not guarantied by Const. art. I, sec. 7, or any other provision of the constitution. As the right exists only by virtue of the statute, a change of venue can be had only upon the terms the statute prescribes. The statute (S. & B. Ann. Stats. sec. 4686*a*) provides that when a change of venue, in any criminal case in any court of record in this state, "shall be applied for in any such court in the manner provided by law, on account of the prejudice of the judge thereof, such court may, in *lieu* of awarding a change of venue therein," make a request of the circuit judge in an adjoining circuit to hold the court where such action is pending, and try the same. By sec. 4680, it is contemplated that the application may be by petition. The right to a change of venue is thus made, by the statute,

subject to the right of the court, in its discretion, to call in some other judge to try the action, in which case no change for that cause is to be awarded. The statute does not authorize the defendant to make an application for a change of venue, coupled with the condition that the court shall not send the case out of the county or shall call in another judge to try it, thus dictating to the court its action upon a subject which the law has confided solely to its discretion. The filing of an affidavit of prejudice of the circuit judge, coupled with such condition, did not deprive the court of jurisdiction to proceed with the trial, but was, in law, equivalent to a request not to order a change of venue. The defendant cannot assign as error the fact that the court complied to that extent with his request, and it was therefore a matter of choice, and not of compulsion, that the defendant went to trial with the affidavit of prejudice of the circuit judge on file.

2. The statute (R. S. sec. 4700) providing for an inquisition, where there is a probability that the accused is, at the time of his trial, insane, and thereby incapacitated to act for himself, to determine whether he is so insane, is substantially a provision in affirmance of a power the court had at common law in such cases, as abundantly appears from the authorities. 4 Bl. Comm. 24, 25; *Crocker v. State*, 60 Wis. 556, and cases cited. This provision is in aid of, and not in derogation of, the constitutional provision (art. I, sec. 7) securing to the accused a fair and impartial trial. The result of such inquisition can have no legal effect upon the main issue.

3. We have considered the evidence, by affidavits and otherwise, upon the subject whether W. F. Shea was a proper and competent person to assist the district attorney in the prosecution of the case. We adhere to what was said in *Biemel v. State*, 71 Wis. 444, 451, that courts, in administering ch. 354, Laws of 1887, "should permit or select

only such assistants as are as unprejudiced and impartial as the prosecutor provided by law;" and we are unable, from the evidence, to say that the discretion of the court was not fairly exercised in this respect, or that the appointment was not one proper to be made. There is no reason to think that Mr. Shea was not as unprejudiced and impartial as the prosecutor provided by law. There was no error in appointing him.

4. After the jury had failed to agree on the special issue of insanity of the defendant, a request on his part that the court proceed to another trial on that issue was properly denied, as the statute provides, in such event, the court shall proceed to trial on the main issue, when the question of insanity involved in such special issue "shall be tried and determined by the jury with the plea of not guilty." R. S. sec. 4697, as amended by ch. 164, Laws of 1883. There was no error in refusing to permit the defendant to admit the homicide in order to obtain the affirmative of the issue of his sanity or insanity involved in the special issue with the general plea of not guilty, or in refusing to allow the defendant the opening and closing on such trial. Where the jury have disagreed on the trial of the special plea of insanity, the trial that follows is to be conducted in like manner as before the statute, and in all respects as therein provided; and the general verdict of guilty will conclude the special plea of insanity as well as the plea of not guilty. But, if it is found that the accused was insane at the time of the commission of the alleged offense, the statute requires that the jury shall also find if he is now sane. This is with the view of determining the question of his future restraint. The statute does not warrant any method of pleading or practice upon the trial of the plea of not guilty that would change the right of opening and closing from that which existed before it was enacted. To have allowed the defendant's request would have been equivalent to permitting the

defendant, in substance, to make an admission of the homicide, and, specially pleading or insisting upon any matter really included in the plea of not guilty of the crime charged, as that he committed the homicide in self-defense, or the like, to obtain the opening and closing of the case. Such a practice is wholly unauthorized by the statute regulating pleadings and trials in criminal cases. The validity of ch. 164, Laws of 1883, in respect to specially pleading the defense of insanity, and the method of trial of such issue, as well as of the plea of not guilty, was fully sustained in *Bennett v. State,* 57 Wis. 69.

5. The exclusion of evidence offered on the part of the defendant, of his acts, conduct, and declarations occurring subsequent to the fourth day after the homicide, and offered as bearing upon the question of his insanity, was, we think, plainly erroneous. It is very generally agreed that evidence of the acts, conduct, and statements of the accused after, as well as before, the homicide, are admissible to show the mental condition of the accused, and as bearing upon the question of his sanity. 2 Greenl. Ev. § 371; 1 Bish. Crim. Law, § 385; Buswell, Insanity, § 216; *Grant v. Thompson,* 4 Conn. 203; *Freeman v. People,* 4 Denio, 9; *People v. Wood,* 126 N. Y. 249; *State v. Lewis,* 20 Nev. 333, 342. Such evidence is admitted on the ground that the facts are "so connected with or correspond to evidence of disordered or weakened mental condition preceding the time of the commission of the offense as to strengthen the inference of continuance, and carry it by the time to which the inquiry relates, and thus establish its existence at that time; or else that they are of such a character as of themselves to indicate unsoundness to such a degree, or of so permanent a nature, as to have required a longer period than the interval for its production or development." *Comm. v. Pomeroy,* 117 Mass. 143, 148; *Bolling v. State,* 54 Ark. 588; *Comm. v. Trefethen,* 157 Mass. 189, and cases cited.

French vs. The State.

The evidence offered appears to have been rejected on the ground that it related to matters subsequent in point of time, that it was cumulative, that it was evidence of the defendant's own conduct while under confinement charged with the crime, offered in his own favor, and that it related to matters occurring after four days from the commission of the offense. While such evidence is competent, and from it the state of mind or insanity of the accused may be inferred, it may relate to actions or declarations so remote in time, or so altered in import and effect by intervening changes in the condition and circumstances surrounding the party, as to be wholly destitute of probative force, and for that reason, in the exercise of a wise discretion in the trial court, may be rejected. *Shailer v. Bumstead*, 99 Mass. 130; *State v. Leehman*, 2 S. Dak. 171. Still such discretion is not an absolute one, but the exercise of it, when the facts appear, is subject to revision in this court. *Comm. v. Trefethen*, 157 Mass. 180, 183. Whether evidence of such acts, conduct, or declarations would have any practical or material probative force must necessarily be the true guide in determining its admissibility. This is necessarily a question addressed, in the first instance, to the sound discretion of the trial court.

Very considerable evidence had been produced, consisting of acts, declarations, and conduct of the defendant on the day of the homicide, and for some time previous, which, in connection with other evidence, was sufficient to require the question of insanity to be submitted to the jury. There was also evidence tending to show that the defendant's condition at the time was the result of a protracted fit of intoxication and drunkenness, caused by the excessive use of intoxicants; and it was claimed that while in this condition, and in a fit of drunken rage, he committed the offense. One of the medical experts testified, in substance, that if his disturbed and excited condition was due to the effects of drinking or the use of intoxicants, as soon as the effect of the

intoxicants would fully pass away he would be restored to his normal condition. No expert testimony was necessary to establish this fact, really within the common experience of the intelligent and discerning. There was evidence to the effect that the defendant's acts, conduct, and declarations had continued to be, in substance, the same as immediately preceding the homicide, until the end of the fourth day. Medicines had been administered to him with a view to restore him to his normal condition, but his condition remained, up to this time, practically unchanged. Under these circumstances, the ruling that restricted the proof of his acts, conduct, and declarations, as bearing upon the question of his sanity, was too strict, and was an unreasonably short limitation. We cannot sanction a rule that would arbitrarily limit the reception of such evidence in such cases to what may have occurred within a period of four days after the commission of the offense. The offer was to extend this proof to succeeding days, and to show the continuance of such condition, but the trial court held that the proof would be cumulative; and, for this and other reasons stated, it was rejected. The effect to be given to such evidence is for the jury, and that the facts and circumstances may be such as to detract from its weight or persuasive force is no ground for its rejection. It ordinarily consists of acts, declarations, or conduct occurring at different times, and observed by different persons, but, in its effect, is directed to the question of the defendant's sanity at the time of the homicide. We are not aware of any rule in the law of criminal evidence that would sanction the rejection of such testimony, going to the main issue, on the ground merely that it is cumulative. The limitation was not as to the number of witnesses in respect to some one particular act, fact, or declaration, but to proof of successive acts, facts, or declarations after the fourth day, which might be shown by different witnesses, and all might tend to establish the

defense.  The right of the accused to have compulsory pro-
cess to compel the attendance of witnesses in his behalf
would be of little value if the court might arbitrarily refuse
to permit them to testify on the ground that the testimony,
although relevant, would be cumulative, thus determining
the amount of evidence the accused might produce in his
defense.  The ruling of the court imposed an unreasonable
limitation in point of time, and deprived the defendant of
the right to produce relevant evidence that might show
that, after a reasonable time had elapsed for his restoration
to his normal condition, his mental condition and situation
remained unchanged, and that they were not, at the time
of the homicide, as claimed by the prosecution, the result of
protracted and excessive intoxication, producing a fit of
drunken excitement and fury.  The defendant was thus
deprived of proper means of rebutting this contention.

The case of *Comm. v. Pomeroy,* 117 Mass. 143, was re-
lied on as sustaining the ruling of the trial court, but it is
widely different and clearly distinguishable from the pres-
ent case.  In that case there had been no change of habit,
conduct, or manner either before or after the homicide, but
the normal condition of the accused (a boy of the age of
fourteen years) continued throughout without disturbance
or change.  "He ate with a hearty appetite, slept soundly
and quietly, and in conversation and manner evinced no
remorse or sense of guilt."  And, "in the evidence relied
on to show the mental condition of the defendant prior to
the homicide, it was not contended that there were any
marked indications of insanity, nor that, with the exception
of an apparent absence of moral susceptibility, or want of
moral sense, there was any relation or correspondence be-
tween the evidence preceding and that subsequent to the
homicide, which gave the latter any especial significance."
It is proper to observe that in that case it was said that, "if
the ruling at the trial had been based solely upon the length

of time that had elapsed, there would be ground for an argument, assuming the evidence to have been in other respects competent, that the period of only *eight or ten days* was too strict a limitation of its admission to be a reasonable exercise of the discretion which rests with the court," and which, as we have seen, is the subject of review.   *Comm. v. Trefethen,* 157 Mass. 184.

It is impossible to lay down any general rule upon the question of remoteness in point of time of such acts, conduct, and declarations, which will apply to all cases alike, beyond that already indicated, namely, that the acts, conduct, or declarations must be so connected with, or related to, or result from, the mental condition of the accused at the time the offense was committed, as to throw light upon or illustrate such condition, and possess some material and practical probative force, and, when taken in connection with other evidence in the case, tend to show that the defendant was insane at the time of the homicide.   The admissibility of such evidence in each case must be determined with reference to its own peculiar facts and circumstances, and we think, in view of the evidence, that the inquiry might have been properly extended up to the time the defendant was first imprisoned in the state prison; but facts disclosed by the evidence may show, however, that this may be too long or too brief a limitation.   If the defendant's mental condition continued unchanged and substantially as it was for several days before and for four days after the homicide, this might warrant a still further extension of the period of inquiry.   In *Freeman v. People,* 4 Denio, 9, evidence of experts as to the condition of the accused four months after the homicide was held competent as tending to prove that he was insane at the time it was committed.   In any event, the period of inquiry should be sufficiently extended to include the subsequent acts, conduct, and declarations of the defendant, so far as they relate to, are connected with, or

grow out of, or illustrate, or afford material evidence of, his mental condition when the homicide was committed.

Although not objected to, one of the medical experts testified, in substance, that "a man suffering from the delirium of delirium tremens has no more control over his actions, in that respect, than a man suffering from delirium produced from any other cause, but still he is sane." It is proper to observe that such evidence should not be received. It is directly opposed to the established rule which affords immunity from the consequences of acts which would otherwise be criminal. "Drunkenness is no excuse, but delirium tremens caused by drunkenness may be an excuse, if it produces such a state of mind as would otherwise relieve the party from responsibility." *Reg. v. Davis*, 14 Cox, Crim. Cas. 564; *Terrill v. State*, 74 Wis. 288; and numerous cases cited by Justice CASSODAY in *Terrill v. State, supra.*

For the reasons already given the judgment of the circuit court must be reversed, and a new trial granted.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded to that court with directions to proceed to a new trial of the special issue of insanity, and such other proceedings, if any, as shall be required by law; and to that end it is ordered that the warden of the state prison, in whose custody the said accused *William G.* *French* now is, do deliver him into the custody of the sheriff of the county of Ashland, who is required to keep him in his custody until discharged therefrom by law.