PEOPLE v. TONER.

1. WITNESSES—HUSBAND AND WIFE—WAIVER OF PRIVILEGE SUBJECTS TO CROSS-EXAMINATION.

In a prosecution for homicide, where defendant called his wife as a witness and she elected to testify, they thereby waived their statutory privilege, and she was subject to cross-examination the same as any other witness.

2. SAME—WAIVER REQUIRES CONSENT OF BOTH.

Neither the husband nor the wife alone can waive the privilege, but to do so requires the consent of both.

The question of drunkenness as a defense to homicide is discussed in notes in 36 L. R. A. 470; 13 L. R. A. (N. S.) 1024; 25 L. R. A. (N. S.) 376; 52 L. R. A. (N. S.) 230.

3. CRIMINAL LAW—MENTAL DERANGEMENT CAUSED BY INTOXICATION
—DEFENSES.

A defendant aware that intoxication was likely to pro-
duce an extraordinary degree of mental derangement in
him is responsible for an act committed while voluntarily
intoxicated, but if by reason of his excessive drinking
he passes into another state and is unable to realize the
quality of his act, and is unable to distinguish between
right and wrong, he may not be held responsible for his
act, provided he is not intoxicated when he commits it.

4. SAME—HOMICIDE—INTOXICATION—TRIAL—INSTRUCTIONS—APPEAL
AND ERROR.

In a prosecution for homicide, an instruction by the trial
judge broad enough to hold defendant responsible for the
crime if committed while mentally deranged by the ef-
fects of intoxication, even if he were not intoxicated when
he committed the act, *held*, although erroneous, not re-
versible error, where the evidence shows that the act was
committed while defendant was intoxicated, and the cor-
rect rule under such circumstances was given in another
part of the charge.

5. HOMICIDE—MURDER—MANSLAUGHTER—EVIDENCE—QUESTION FOR
JURY.

It was the province of the jury and not of the court to
decide whether there was much or little testimony which
would reduce the crime from murder to manslaughter.

6. SAME—INSTRUCTION—HARMLESS ERROR.

An instruction by the trial judge that there was little, if
any, evidence which would reduce the crime from murder
to manslaughter, *held*, although erroneous, not reversible
error, in view of the evidence and the contention of the
prosecutor that the blow was struck in an attempt to rob,
and the further instruction to the jury that the questions
of fact were for them to determine.

Error to Oakland; Covert (Frank L.), J.    Submit-
ted January 12, 1922.    (Docket No. 151.)    Decided
March 30, 1922.

J. Glenn Toner was convicted of murder in the first
degree, and sentenced to imprisonment for life in the
State prison at Jackson.    Affirmed.

*Charles S. Matthews* and *Chauncey L. Newcomer,* for appellant.

*A. Floyd Blakeslee,* Prosecuting Attorney, for the people.

BIRD, J.   In January, 1920, the defendant, J. Glenn Toner, and Ellsworth Granzow were neighbors and resided out Woodward avenue north of Detroit near the 10-mile road.   Granzow was without family and lived alone.   Toner lived half a mile from him.   He was temporarily estranged from his wife and was living alone.   Both men were in the habit of indulging in intoxicating liquors.   On Sunday, January 4th, at about 4 o'clock in the afternoon, they secured a 10-gallon cask of hard cider and a quart of whisky and drank some of it that evening.   Monday and Tuesday, January 5th and 6th, they drank some but were about as usual.   On Tuesday Toner went hunting for rabbits with an automobile party that stopped at his house.   They left his home about 2 o'clock in the afternoon, and, when they left, Toner and Granzow were the only ones at Toner's house.   In the early evening Wednesday, Toner went to Royal Oak and asked the jailer to lock him up.   He did so and released him the next morning, when he started for Detroit on the interurban.   He alighted at the Ford automobile plant.   About that time he took some bichloride of mercury tablets and, by reason thereof, he was taken to a hospital.   Later, at the hospital, an officer was called at his request and he disclosed to him that he had killed a man, that he had hit him on the head with a hammer.   The officer obtained such details as he could and, from this information, an investigation was made, and Granzow was found at Toner's house with his skull crushed and his body partially paralyzed.   He was taken to a hospital but died the next day.   Toner was subsequently arrested for murder.   It was the theory of the prosecutor that

Toner needed money and that in the attempt to rob Granzow the fatal blow was struck. At the trial the defense made was that Toner was suffering from delirium tremens by reason of excessive drinking, and that he had no recollection of events from Tuesday afternoon, or night, until he was taken to the hospital in Detroit on the following Thursday morning. Upon the proofs submitted by the respective parties the jury found Toner guilty of murder in the first degree.

1. Defendant's wife was called and testified as a witness in his behalf. Upon cross-examination, when the prosecutor attempted to elicit some answers to questions involving communications between her and her husband, they were objected to on the ground of her statutory privilege. The trial court admitted a part of the testimony sought and rejected a part. Subsequently he struck out all of it which involved communication between defendant and his wife. The defendant's contention was that the cross-examination could cover only the field traversed by the examination in chief. The prosecutor contended that when she took the stand and testified in behalf of defendant she waived her privilege and he was then at liberty to cross-examine her fully in regard to facts pertinent to the case, and he cites in support of his contention the case of *People* v. *Gosch*, 82 Mich. 22. A similar situation arose in that case, and this court said:

"Some claim is made that the testimony drawn out on the cross-examination of Mrs. Gosch was incompetent. Mrs. Gosch was introduced as a witness by the respondent, and gave testimony in his behalf. On taking the witness, counsel for the people had the right to a full and fair cross-examination upon all matters relevant to the case; and the fact that she was the wife of the respondent could not, upon cross-examination, shield her from any inquiry which might properly be made of any other witness."

Whatever the rule may be elsewhere we think this

is the rule in this State. It would be manifestly unfair to permit a defendant and his wife to release their privilege as to such matters as would be helpful to him, and then claim the privilege as to any pertinent inquiry which might be made by the prosecutor. Under such a rule cross-examination would be a farce. When defendant called his wife as a witness he thereby waived his privilege. It was then optional with her as to whether she would testify. If she elects to, and does, testify, she thereby waives her privilege. Neither the husband nor wife alone can waive the privilege. It requires the consent of both (3 Comp. Laws 1915, § 12555).

Defendant cites, in support of his contention, the cases of *Carter* v. *Hill*, 81 Mich. 275, and *People* v. *Gordon*, 100 Mich. 518. Neither of these cases is in point. In neither was the privilege waived by both husband and wife. In the first case cited the husband testified to communications with his wife before marriage without her consent. In the other case the wife was called by the prosecutor without the consent of either. The testimony given upon cross-examination should not have been stricken out.

2. The defense gave evidence that defendant was addicted to drinking intoxicating liquors and showed many instances in the past when defendant had been afflicted with delirium tremens following periods of excessive drinking, and it was claimed that if he struck the blow that killed Granzow he did it while he was suffering from delirium tremens and was thereby excused. The trial court was requested to charge the jury that if defendant struck the blow which killed Granzow and at the time he was suffering from delirium tremens and unable to distinguish between right and wrong that he would not be responsible for the act. The trial court refused this request, but did charge on that question, as follows:

"If the respondent in this case from his past experience or information he had while sane, and before drinking on that day, or that period of the alleged murder or before that time, covering that period when he claims he first began the drinking which produced the alleged insanity, had good reason to believe that owing to a dormant tendency to insanity, intoxication would be likely to produce an extraordinary degree of mental derangement, beyond the effects likely to be produced upon persons clear of any such tendency, he must be held to have intended this extraordinary derangement, as well as the intoxication and other results produced by it. But if he was ignorant that he had any such tendency to insanity, that is if he did not know that insanity was going to be produced by that experience, and had no reason from his past experience or from his information derived from others, to believe that such extraordinary effects were likely to result from the intoxication, then he ought not to be held responsible for such extraordinary effects."

Defendant's counsel insist that this was error, that if defendant was suffering from delirium tremens to such an extent that he was unable to distinguish between right and wrong, and to know the quality of his act, then he could not be convicted of the charge. The rule contended for by counsel is laid down in *United States* v. *Drew,* 5 Mason (U. S.), 28 (25 Fed. Cas. No. 14,993):

"We are of the opinion that the indictment upon these admitted facts cannot be maintained. The prisoner was unquestionably insane at the time of committing the offense, and the question made at the bar is, whether insanity, whose remote cause is habitual drunkenness, is, or is not, an excuse in a court of law for a homicide committed by the party, while so insane, but not at the time intoxicated or under the influence of liquor. We are clearly of opinion that insanity is a competent excuse in such a case. In general, insanity is an excuse for the commission of every crime, because the party has not the possession of that reason, which includes responsibility. An ex-

ception is, when the crime is committed by a party while in a fit of intoxication, the law not permitting a man to avail himself of the excuse of his own gross vice and misconduct, to shelter himself from the legal consequences of such crime. But the crime must take place and be the *immediate* result of the fit of intoxication, *and while it lasts;* and not, as in this case, a remote consequence, superinduced by the antecedent exhaustion of the party, arising from gross and habitual drunkenness. However criminal, from a moral point of view, such an indulgence is, and however justly a party may be responsible for his acts arising from it to Almighty God, human tribunals are generally restricted from punishing them, since they are not the acts of a reasonable being. Had the crime been committed while Drew was in a fit of intoxication, he would have been liable to be convicted of murder. As he was not then intoxicated, but merely insane from an abstinence from liquor, he cannot be pronounced guilty of the offense. The law looks to the immediate, and not to the remote cause; to the actual state of the party, and not to the causes which remotely produced it. Many species of insanity arise from what, in a moral view, is a criminal neglect or fault of the party, as from religious melancholy, undue exposure, extravagant pride, ambition, etc. Yet such insanity has always been deemed a sufficient excuse for any crime done under its influence."

Counsel also cite in support of this rule: *State* v. *Kidwell,* 62 W. Va. 466 (59 S. E. 494, 13 L. R. A. [N. S.] 1024) ; *United States* v. *McGlue,* 1 Curtis (U. S.), 1 (26 Fed. Cas. No. 15,679) ; *People* v. *Travers,* 88 Cal. 233 (26 Pac. 88) ; *Beasley* v. *State,* 50 Ala. 149 (20 Am. Rep. 292) ; *Maconnehey* v. *State,* 5 Ohio St. 77; *State* v. *Hand,* 1 Marv. (Del.) 545 (41 Atl. 192) ; *State* v. *Kavanaugh,* 20 Del. 131 (53 Atl. 335) ; *State* v. *Dillahunt,* 3 Har. (Del.) 551; *State* v. *McGonigal,* 5 Har. (Del.) 510; *French* v. *State,* 93 Wis. 325 (67 N. W. 706) ; *People* v. *Rogers,* 18 N. Y. 9 (72 Am. Dec. 484) ; 2 Crim. Def. 629, 630; *Perkins* v. *State,* 228 Fed. 408, 142 C. C. A. 638; *Martin* v. *State,* 100 Ark.

189 (139 S. W. 1122); *Cochran* v. *State,* 65 Fla. 91 (61 South. 187).

The prosecutor cites the case of *Roberts* v. *People,* 19 Mich. 400, and contends the charge was in accord with this case. It was there said in part:

"If, therefore, the intoxication was voluntary on his part—as all the evidence tended to show unless he had become insane before he resorted to drinking, as presently explained,—any degree of insanity thus produced would be a part of the consequences of such voluntary intoxication. And if, from his past experience or information, he had, while sane and before drinking, on that day, good reason to believe that, owing to a dormant tendency to insanity, intoxication would be likely to produce an extraordinary degree of mental derangement beyond the effects likely to be produced upon persons clear of any such tendency, he must be held to have intended this extraordinary derangement as well as the intoxication and the other results produced by it. And the same degree of mental incompetency would be required to render him incapable of entertaining the intent, whether caused by the intoxication combined with the insanity thus produced, or by the intoxication alone. And the same principle already laid down in reference to the question of capacity, as affected by intoxication alone, would apply with equal force to this aspect of the case."

We are not impressed that *Roberts* v. *People* is out of harmony with the cases cited. The trial court obviously intended to follow the rule as announced in this case, but we think the charge gave the following language in *Roberts* v. *People* too broad a construction:

"If, therefore, the intoxication was voluntary on his part—as all the evidence tended to show unless he had become insane before he resorted to drinking, as presently explained—any degree of insanity thus produced would be a part of the consequences of such voluntary intoxication."

The trial court extended this language to include any insanity which might follow a fit of intoxication. It must be remembered that this language by Mr. Justice CHRISTIANCY was used while considering the *immediate effects* of intoxication—the different degrees of alcoholic disturbances which might be produced by excessive drinking and while the person was in liquor. We do not think it was intended to have any reference to a case of delirium tremens, which had been occasioned by antecedent intoxication. The rule laid down in *United States* v. *Drew, supra,* is that when one, by reason of a period of excessive drinking, passes into another state, namely, that of delirium tremens, and is unable to realize the quality of his act and is unable to distinguish between right and wrong, he cannot be held responsible for his act, provided, however, he is not intoxicated when he commits the act. Were the facts such in this case as to raise this question it is quite likely this court would be in accord with the rule announced by the cases cited, but we think the testimony in this case does not raise that question. The testimony tends to show that if Toner struck the fatal blow he did so when he was in a fit of intoxication, and that if he had delirium tremens they came on to him after the event. His own testimony shows that the 10-gallon cask of cider and the quart of whisky were not obtained so as to be available until 4 o'clock Sunday afternoon. Some of it was drank that evening. Monday and Tuesday both men were about as usual. There is some testimony that a few drinks were taken on Monday and Tuesday, but the witnesses who saw them agree that they did not appear to be intoxicated. After the hunting party left on Tuesday afternoon they commenced to drink and Toner's admissions to the officers in the hospital show he was drunk when he hit Granzow. It is certain that if Toner was in the intoxi-

cated stage when he struck the blow, he was not in a state of delirium tremens. Delirium tremens is a later stage of a drunk. The drinking period precedes it. Delirium tremens is the after effect of excessive drinking. In fact, delirium tremens comes on because of the want of whisky and not when one is in and has the full effect of it. In view of this it must be said that there was no testimony from which the jury could find that Toner had delirium tremens at the time the blow was struck. There is considerable testimony that at the time he asked to be locked up on Wednesday he had hallucinations and was suffering from delirium tremens, and these evidences were present on Thursday, but these symptoms did not appear until after the event. The failure, therefore, of the trial court to give the correct rule with reference to delirium tremens is of little importance. Under the testimony we think he should have given no charge with reference to it. He did give the correct rule as to a crime committed by one who was voluntarily intoxicated and this, under the testimony, was the only rule applicable.

3. The court used the following language while instructing the jury as to a verdict of manslaughter:

"Embraced in this information also is the third offense known as manslaughter, although if you should find that the respondent struck the blow which killed the deceased Granzow, as claimed by the prosecution, there is very little, if any, evidence which would reduce the crime from murder to manslaughter."

Counsel say it was the province of the jury and not of the court to decide whether there was much or little testimony which would reduce the crime from murder to manslaughter. Counsel are, undoubtedly, correct in this. If we, however, keep in mind the contention of the prosecutor that the blow was struck in an attempt to rob Granzow, the statement that there

was little testimony to reduce the crime of murder to manslaughter was probably correct. It was for the jury to measure the quantity of proof, and while the statement might better have been left unsaid we are unable to say that it was reversible error, inasmuch as the court explained to the jury quite fully what constituted the crime of manslaughter, and also explained the circumstances under which defendant could be convicted of that crime. And he further instructed them that the questions of fact were for them to determine.

We are unable to find in the record any errors which should reverse the case.

The judgment of conviction is affirmed.

FELLOWS, C. J., and WIEST, CLARK, SHARPE, MOORE, and STEERE, JJ., concurred.

The late Justice STONE took no part in this decision.