STATE, Respondent and Cross-Appellant, v. MENDOZA, Appellant and Cross-Respondent.

*No. 75–806–CR.  Argued June 2, 1977.—Decided October 4, 1977.*
(Also reported in 258 N. W. 2d 260.)

For the appellant and cross-respondent there were briefs by *Stephen M. Glynn, James M. Shellow* and *Shellow & Shellow*, and oral argument by *Stephen M. Glynn* and *James M. Shellow*, all of Milwaukee.

For the respondent and cross-appellant the cause was argued by *E. Michael McCann*, district attorney for Milwaukee county, with whom on the brief were *Bronson C. La Follette*, attorney general, *William L. Gansner* and *David J. Becker*, assistant attorneys general.

DAY, J.  November 11, 1974, James Ray Mendoza, the defendant, was found guilty by a jury of two counts of first degree murder[1] in the shooting deaths of two Milwaukee police officers. Although the crimes charged

---

[1] Sec. 940.01, Stats.

took place in the city and county of Milwaukee, the place of trial was moved to the city of Sparta in Monroe county on the *sua sponte* order of the trial court. November 12, 1974 Mendoza was sentenced to two consecutive terms of life imprisonment. He appeals from the judgment of conviction and orders denying post-conviction motions entered November 3, 1975.

We conclude the conviction cannot stand and a new trial must be had. Accordingly, this opinion deals with those issues which lead us to that conclusion or which are likely to be raised again at the new trial. Because sufficiency of evidence is not at issue in this case, the recitation of facts is similarly limited.[2]

This issues which we deem crucial to the disposition of this appeal are as follows:

I. Did the trial court err in moving the trial from Milwaukee county, where the crime was committed, to Monroe county over the timely objection of the defendant?

II. Did the trial court err in refusing to instruct the jury on (a) manslaughter: causing death of another unnecessarily in the exercise of self-defense, (b) self-defense, or (c) manslaughter-heat of passion.

We also consider the following issues as bearing on the conduct of a new trial:

III. Was defendant entitled to rebut the testimony of a polygraph examiner, the admissibility of whose opinion defendant had stipulated to, with the testimony of another polygraph expert?

IV. Did the court err in refusing to admit evidence consisting of an expert opinion, and to instruct the jury on a statutory presumption, that the deceased officers were intoxicated?

[2] *See, State v. Lenarchick,* 74 Wis.2d 425, 429, 247 N.W.2d 80 (1976).

Defendant has admitted shooting to death two off-duty Milwaukee police officers, Robert Riley and Thomas Matulis, in the early hours of July 10, 1974 in Milwaukee. Prior to the killings defendant and two friends, Jesus Fiscal and Arnaldo Hernandez, were drinking at a tavern on South 13th Street. Defendant admitted that he had been drinking beer and smoking marijuana since the afternoon of July 9. At a nearby tavern officers Riley and Matulis met with Matulis' younger brother James and his three friends, James Reichel, Gerald Krolikowski and Jerome Sobczak. This group then moved down the street to another tavern which was two doors away from where the defendant and his friends were.

When the defendant and his companions exited the tavern at about 2:00 a.m., they encountered two unidentified men who were standing directly across the street. These men were not connected with nor in close proximity to the slain officers or their group. One of the two unidentified men hurled a glass object at the defendant's group. Jesus Fiscal testified he then threw a beer bottle back across the street at the two men. The defendant then pulled out a twenty-two caliber revolver and said, "I'll scare those guys" and discharged a bullet into the air.

At the time of the incident officers Matulis and Riley were about one-half block down the street on the same side of the street as defendant. The officers were in casual dress and unarmed, as were their friends.

After hearing the gunshot, the two officers and James Matulis approached the defendant and asked him why he had shot in the air. Defendant pointed the gun at them and then he and his companions crossed the street and quickly proceeded north. The two officers and James Matulis followed them across the street. Meanwhile, Krolikowski, Reichel and Sobczak, the officers' other friends, paralleled their movements north on the other side of the street. At some point James Matulis re-

crossed the street joining the three who were keeping their distance.

Defendant testified,

"I continued walking north, and then as we were walking, I was walking kind of sideways, and I turned around and one of them seemed like he was going to grab me, and I pushed him and I hit him with my right hand where I had my gun. . . (A)s I did that I told him to stay back or I would blow his — head off."

Then, as the pursuing officers Riley and Matulis passed Riley's car, Riley entered his automobile and removed his revolver from the glove compartment. Riley rejoined Thomas Matulis on the sidewalk. The two men then identified themselves as police officers. Defendant testified he turned, placed his weapon in his pants, and ran.

The struggle which led to the shooting deaths then ensued. Evidence at trial raised at least three theories of how the struggle took place.

Defendant's version of the struggle as put forward at trial, is as follows:

One of the officers grabbed him, turned him around and started hitting him. Defendant threw his revolver to the ground and told them, "they didn't have to hit me, that they had me already." The officers continued to hit him between two cars parked at the curb. They were hitting him "with something hard" and defendant continued to protest. The defendant denied using force against the officers during the struggle. With one knee on the ground he held his hands over his head to protect himself from the blows, he testified.

While kneeling, defendant grabbed one of the hands striking him and held it against the hood of the car, he said. As he ducked he noticed the hand held a gun. He grabbed the gun. Then,

"(T)hey were still hitting me. They hit me again with something hard. I told them they didn't have to hit me no more, and as I was telling them that they hit me again. I rose the hand that I had towards the ground, I pointed it towards where the punches were coming from, I shot one, I turned it towards the back of me and I shot again."

The shots were about a second and a half or two seconds apart. Defendant further testified he shot the officers because they would not stop beating him. He did not run away, he said, because, "I couldn't. They were hitting me. They were over me."

Defendant's claim he was being beaten by the two officers was partially corroborated by state's witness James Reichel, who had been with the officers prior to the struggle. He testified, "I thought they were going to . . . beat up the tall Mexican. . . . It seemed they had him, you know, two against one." However, at the time of the actual shootings Reichel could not see the actual position of the three men.

Gerald Krolikowski, another state's witness, testified the three persons engaged in the fight were the two slain officers and one of the Mexican-Americans.

The state's factual theories of the case were substantially different from the defendant's story. Two versions of the events were presented: The first theory was that the defendant was the aggressor and he killed the officers attempting to escape. Defendant had brandished a gun earlier and had threatened the police. A witness observing from a nearby house testified that during the melee she heard someone say four times in a Spanish accent, "I'm going to blow your — brains out with this gun."

Another state theory alternatively presented to the jury was that the fight began between two Mexican-Americans (including defendant) and one of the officers, whereupon the officer was shot; the second officer was

shot coming to his aid. This theory was based on the testimony of state witnesses who testified the men doing the beatings had hair styles similar to those of defendant and Fiscal. Several witnesses said two men were beating a third who was pushed up against the hood of a car. Bystander Donald Pachowicz, observing from his home, testified that the man pinned to the hood was the man he later found slain on the sidewalk, officer Riley. Pachowicz also heard someone say, "hit him again, hit him again," and then heard two shots.

Autopsies were conducted on the slain officers. These showed that Matulis had .14% alcohol by weight in the blood and .23% alcohol by weight in the urine. The alcohol level in the urine indicated that sometime prior to death, the blood alcohol level was .17% to .18%. Riley had .13% alcohol by weight in the blood, and .21% alcohol by weight in the urine. The alcohol in the urine indicated that sometime prior to death the blood alcohol level was .16% to .17%.

Additionally, Matulis had a recent horizontal cut on the forehead one-half inch long and scrapes on the right hand and left knee. The autopsy of Riley revealed skinned areas on both knees. A medical examination of defendant following the shootings revealed a laceration in the left perital region of the head, two centimeters long and three millimeters deep.

Among the various items of evidence removed at the scene was a clump of hair which was said to be forcibly removed. This hair was consistent only with the hair of the defendant. Other hair, said to have "fallen naturally" was consistent only with the hair of officer Matulis.

## I.  *Venue.*

On September 9, 1974, one month before commencement of the trial, the trial court *sua sponte* ordered the place of trial moved from the city of Milwaukee, Milwau-

kee County to the city of Sparta, in Monroe County. Conceding that "the place of trial, is a matter which under the constitution is peculiarly that of the defendant" the trial court found "that the defendant will, absent drastic action in what the court considers to be an aggravated situation, be denied the right to a fair trial." Counsel for the defendant immediately objected that the ruling came as a surprise to the defendant. The record is silent as to any position taken by the state at that time.

At the time of the order changing the place of trial defendant's counsel objected on a number of grounds, including the financial burden such change would impose on defendant's family and relatives; the absence of a record establishing prejudicial publicity; the fact there was no finding the news coverage in Sparta was less pervasive than it was in Milwaukee; the fact that the ruling came as a complete surprise to the defendant; and the opinion of defense counsel that the publicity, though extensive, was not prejudicial.

Two weeks later, with permission, the defendant filed written objections on the additional grounds, *inter alia,* that the *sua sponte* order was in violation of sec. 971.22, Stats., and that "the order denies defendant the right of being tried in the vicinage of the offense as guaranteed in the Wisconsin and U. S. constitutions."

The order was based on the trial court's finding of extensive and prejudicial pre-trial publicity. An excerpt of the court's finding is as follows:

"The court considers that, (a) the nature and character of the information disseminated in this community through the news media and group activity raises a reasonable probability that the defendant cannot here and in the near future, as a consequence, be assured a fair trial; (b) that the pretrial publicity in its intensity and breadth has fatally affected the jury source so far as the defendant is concerned; (c) the relatively brief

period of time which has elapsed since the alleged commission of the alleged offenses and which remains before trial accentuates the pervasiveness and the effect of the pretrial information, both from the standpoint of timing and specificity; (d) the State has not contributed to the pretrial publicity; and (e) the defendant is charged with not one but two murders, the most serious offenses in the criminal code."

The court based its finding on its personal contacts with the community, stating that it had been repeatedly questioned by citizens in the community as to the facts involved. The court also took an informal poll:

"In addition the court, without disclosing its identity, has made extensive contacts with residents of this community in shopping centers, restaurants, and other public places in an effort to determine community reaction to the pretrial information thus far disclosed."

Approximately eleven months later, during consideration of motions after verdict, the court granted the state's motion to add to the record evidence of the pre-trial publicity. This evidence consisted of copies of radio and television news transcripts and newspaper articles.

### A. *Power Of The Court To Change Venue.*

The fundamental question presented is whether the trial court had authority, on its own initiative, to order the place of trial changed over the timely objection of the defendant on whose behalf the order was made. We hold the trial court did not have such authority under the facts in this case.

A consideration of the possible sources of court authority to change the place of venue under circumstances such as were present in this case must include the constitution, the statutes, this court's interpretation of those

laws, and the inherent power of the court. It is appropriate to begin with the constitution and the statutes.

Wisconsin Const. art. I, sec. provides:

*"Rights Of Accused.* Section 7. In all criminal prosecutions the accused shall enjoy the right to be heard by himself and counsel; to demand the nature and cause of the accusation against him; to meet the witnesses face to face; to have compulsory process to compel the attendance of witnesses in his behalf; and in prosecution by indictment or information, to a speedy public trial *by an impartial jury of the county or district wherein the offense shall have been committed, which county or district shall have been previously ascertained by law."*[3] (Emphasis added.)

Sec. 971.19 (1), Stats. reads,

"Criminal actions shall be tried in the county where the crime was committed, except as otherwise provided."

And finally, sec. 971.22, Stats. is as follows:

*"971.22 Change Of Place Of Trial.* (1) The defendant may move for a change of the place of trial on the ground that an impartial trial cannot be had in the

---

[3] Const. art. I, sec. 7 does not restrict venue. Rather, it restricts the locale from which the jury can be picked. In *Wheeler v. State*, 24 Wis. 52, 53 (1869), the court speculated Wisconsin's constitutional provision was copied at least in part from U. S. Const. amendment 6, which insures an accused,

". . . the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law."

This amendment was construed as a modified form of the common law right to be tried by a "jury of the vicinage" in *Williams v. Florida*, 399 U.S. 78, 92–96 (1970). "Vicinage" means neighborhood and "vicinage of the jury" means jury of the neighborhood. *Ibid.* n. 35. The Wisconsin Constitution similarly insures a right, not to venue, but to a jury picked from the county or district wherein the crime shall have been committed. Reference to "venue" in this opinion is made with this qualification in mind.

county. The motion shall be made at arraignment, but it may be made thereafter for cause.

"(2) The motion shall be in writing and supported by affidavit which shall state evidentiary facts showing the nature of the prejudice alleged. The district attorney may file counter affidavits.

"(3) If the court determines that there exists in the county where the action is pending such prejudice that a fair trial cannot be had, it shall order that the trial be held in any county where an impartial trial can be had. Only one change may be granted under this subsection. The judge who orders the change in the place of trial shall preside at the trial. Preliminary matters prior to trial may be conducted in either county at the discretion of the court. The judge shall determine where the defendant, if he is in custody, shall be held and where the record shall be kept."

The literal language of these provisions is clear with respect to who, under these provisions, may bring a motion to change the place of trial. Const., art. I, sec. 7 states, "the *accused* shall enjoy. . . ." Sec. 971.19, Stats. provides that except as otherwise provided, "(c)riminal actions *shall* be tried in the county where the crime was committed," and sec. 971.22, states, "(t)he *defendant* may move for a change of the place of trial."

This court has interpreted this constitutional section and the predecessors of these statutes a number of times. The precedent is clear that the literal language of these sections accurately states the law on the subject: Only the defendant can waive his right to venue where the crime was committed. In *Oborn v. State,* 143 Wis. 249, 126 N.W. 737 (1910) the court held that the right to be tried where the crime is committed belongs to the defendant. Thus, any statute providing for a change of venue must be in harmony with that right:

"The constitution makes no provision for a change of venue in a criminal case, so any such change must be referable to some statute which is in harmony with the

guaranteed right, unless such right may be waived. *French v. State,* 93 Wis. 325, 67 N.W. 706. The Statutes, at sec. 4680 (Stats. 1898), provide for a change of venue in specified circumstances upon application of the accused. That contemplates competency to waive the constitutional right by invoking the statutory privilege to a change and has been held valid on the ground of such competency in fact existing. *The idea is that the trial must be held in the county where the crime shall have been committed, unless changed upon application of the defendant (Wheeler v. State,* 24 Wis. 52; *Bennett v. State,* 57 Wis. 69, 75, 14 N. W. 912), and as the right to a change is purely statutory, unless it is invoked upon the terms and in the manner provided by the statutes, it does not exist at all. *French v. State, supra."* 143 Wis. at 257. (Emphasis supplied.)

Consistent with this analysis is the earlier case of *Wheeler v. State,* 24 Wis. 52 (1869) in which venue was changed on the motion of the district attorney made upon his affidavit stating his belief that "an impartial trial could not be had in that county, by reason of its being a small county, and the case having been notorious, and having occasioned much excitement." 24 Wis. at 52. This court held that the statute authorizing a change of venue on the motion of the prosecutor, over the objection of the accused, was unconstitutional and void.

■ A defendant may apply for a change of venue and thereby waive his right under the constitution.

■ The authority to change venue has been held to be strictly statutory. In *French v. State,* 93 Wis. 325, 67 N.W. 706 (1896) the court said,

"The right to a change of venue depends entirely upon the statute. It is not guaranteed by Art. I, sec. 7, or by any other provision of the constitution. As the right exists only by virtue of the statute, a change of venue can be had only upon the terms the statute prescribes." 93 Wis. at 335.

*Accord, Baker v. State,* 56 Wis. 568, 575, 14 N.W. 718 (1883) ; *Hanley v. State,* 125 Wis. 396, 400, 104 N.W. 57 (1905) ; *State ex rel. Carpenter v. Backus,* 165 Wis. 179, 182, 161 N.W. 759 (1917).

Conceding sec. 971.22, Stats. authorizes only the defendants to change venue, the state argues that nevertheless the statute must be read in light of *State v. Dean,* 67 Wis.2d 513, 227 N.W.2d 712 (1975). The critical language of that case is found at 67 Wis.2d page 526:

"The first issue raised by the defendant is that the trial court should have ordered a change of venue on its own motion because of media publicity even though no motion for a change of venue was made by defense counsel, nor was any motion made to postpone the trial. This court has many times recognized that a trial court should act on its own motion when confronted with aggravated circumstances from which it appears that a jury's dispassionate evaluation of the evidence is rendered doubtful because of the pressure of publicity surrounding a case. *State v. Alfonsi* (1967), 33 Wis.2d 469, 481, 147 N.W.2d 550; *State v. Kramer* (1969), 45 Wis.2d 20, 30, 171 N.W.2d 919."

In neither *Dean* nor the cases on which it relied did the defendant oppose a change of venue. In *State v. Kramer, supra,* the defendant moved for change of venue. In *Dean* and *State v. Alfonsi, supra,* defendant's trial counsel did not so move but on appeal the change of venue was advocated by the defendant.

In *Alfonsi,* 33 Wis.2d at 480, it was said,

"The defendant's attorneys did not request a change of venue, nor did they seek a continuance of the trial. Although it may be said that the defense thus waived two of the available safeguards, we note that under proper circumstances a trial court has an affirmative duty to take steps to protect the right of a defendant to a fair trial. In *Sheppard v. Maxwell* (1966), 384 U.S. 333, 362, . . . the court said:

" 'Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given

the pervasiveness of modern communications, and the difficulty of effacing prejudicial publicity from the minds of the jurors, the *trial courts must take strong measures* to ensure that the balance is never weighed against the accused.' (Emphasis added.)

"When it appears that dispassionate evaluation of the evidence is rendered doubtful because of the pressure of publicity, the trial court must act *sua sponte*. In the *Sheppard Case,* at page 363, the court observed:

" '. . . where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity.' "

Of the three Wisconsin cases these things can be said: In none did the defendant protest a change of venue; in none did the court consider Const. art. I, sec. 7 or the cases already cited holding that only the defendant can waive his constitutional right; in none did the court conclude that the court should have changed the place of trial on its own motion. These cases did not hold, moreover, that the court could disregard the demand of the defendant to a jury from the county or district where the crime was committed. What they did hold is that the trial court is not a passive spectator in the effort to insure a fair trial.

Because *Dean, Kramer, Alfonsi* and *Sheppard* were all concerned with the defendant's right to a fair trial, it is important to note that the right to a jury of the county or district where the crime was committed is also a component of the right to a fair trial. *See, United States v. Johnson,* 323 U.S. 273, 275 (1944).

In the instant case defendant, aided by competent counsel,[4] consciously determined that he wished to be

_____

[4] We express no opinion where competency of counsel is at issue, or where other unusual circumstances exist, such as danger

tried by a jury in Milwaukee. This consideration included the desire to have jurors from the same environment in which the crime took place chosen from a pool having a Mexican-American community; the effect a trial far from home would have on a defendant who might otherwise enjoy the moral support of family and friends; the ability to investigate during the trial and to locate and secure rebuttal witnesses; and the convenience of counsel in being close to his office, both from a logistical and financial point of view. (Br. App. 63–64).

Because these factors do play a part in the consideration of fairness of a trial, the strategic choice, made by the defendant and guaranteed by the constitution must be respected.

It is the state's position that the right to be tried where the crime is committed is predicated on the right to an impartial jury. If an impartial jury is unobtainable, the state reasons, then the place of trial guarantee is unavailable.

But because the venue right is grounded on policy considerations of its own, we think it unwise, particularly in light of the aforementioned precedent, to construe one right as contingent upon another. Both rights seek to insure the ultimate right to a fair trial. And in most cases, the rights are not mutually exclusive. The right to an impartial jury may be vindicated in ways other than the compelled relinquishment of the right to venue where the crime was committed. As this court said in *McKissick v. State*, 49 Wis.2d 537, 182 N.W.2d 282, 286 (1971):

"The constitutional guarantee of a fair trial before an impartial jury is not, however, synonymous with a

to defendant, the witnesses or court personnel or other bizarre or unusual circumstances that would interfere with the proper administration of justice.

change of venue. Change of venue is only one method of guaranteeing a fair trial; others are voir dire and continuance."

Certainly, if the defendant objected to a change of venue, he would not be heard later to complain that he was entitled to a change of venue, because he would have waived such opportunity. *Cf. Dolan v. State,* 48 Wis.2d 696, 703, 180 N.W.2d 623 (1970). But so long as his choice is made knowingly and intelligently, it should be his.[5]

Other jurisdictions are divided on the question before the court. We have read the cases supporting both the state's[6] and the defendant's[7] position but derive from

---

[5] *Cf. Faretta v. California,* 422 U.S. 806 (1974) where it was held a defendant has a constitutional right of self-representation. There the court noted that "the help of a lawyer is essential to assure the defendant a fair trial." 422 U.S. at 832–833.

"And a strong argument can surely be made that the whole thrust of those decisions must inevitably lead to the conclusion that a State may constitutionally impose a lawyer upon even an unwilling defendant.

"But it is one thing to hold that every defendant, rich or poor, has the right to the assistance of counsel, and quite another to say that a State may compel a defendant to accept a lawyer he does not want. The value of state-appointed counsel was not unappreciated by the Founders, yet the notion of compulsory counsel was utterly foreign to them. And whatever else may be said of those who wrote the Bill of Rights, surely there can be no doubts that they understood the inestimable worth of free choice." *(Ibid.* 833–834).

[6] *Barry v. Truax,* 13 N.W. 131, 99 N.W. 769 (1904); *State v. Valdez,* 83 N.M. 632, 495 P.2d 1079 (1972); *Minnesota v. Miller,* 15 Minn. 344 (1870); *Mast v. Superior Court,* 102 Ariz. 225, 427 P.2d 917 (1967).

[7] *In re Nelson,* 19 S. Dak. 214, 102 N.W. 885 (1902); *Kirk v. State,* 41 Tenn. 344 (1860); *State v. Knapp,* 19 P. 728 (Kan. 1888); *State ex rel. Hartinger v. Court of Common Pleas of Perry County,* 86 N.E.2d 810, 813 (Ohio Ct. App. 1948); *State v. Greer,* 22 W. Va. 800, 805 (1883).

this examination no reason to depart from our own precedent.[8]

That precedent holds that any venue change must be pursuant to defendant's waiver of his right to a jury from the county or district where the crime was committed. The trial court erred in moving the place of trial to Sparta over the objection of the defendant. We hold that the proceedings held there are void. *Wheeler, supra,* 24 Wis. at 59.

### B. *Procedure By Which Venue Was Changed.*

At no time during the proceeding has it been suggested that (a) safety of court personnel, witnesses or others was a factor in the change of venue or (b) defendant's desire to remain in Milwaukee was not knowingly and intelligently made. These situations are not before us and we express no opinion on them.

A motion for change of venue is addressed to the sound discretion of the court.[9] But a decision made without reasonable inquiry and examination of facts in the record is, on its face, an abuse of discretion.

---

[8] We note that *Mast, supra,* relied on by the state, held that the state could obtain a venue change only for its own benefit; it specifically held the state could not move for such change for the *defendant's* benefit, over the defendant's objection. 427 P.2d at 918–919.

*Miller, supra,* also relied on by the state, has been criticized because it did not consider this court's *Wheeler* decision and because "the contention of the state was accepted, rather than discussed . . ." *In re Nelson, supra.*

[9] *Turner v. State,* 76 Wis.2d 1, 26, 250 N.W.2d 706 (1977); *Ruff v. State,* 65 Wis.2d 713, 720, 223 N.W.2d 446 (1974); *Jones v. State,* 66 Wis.2d 105, 109, 223 N.W.2d 889 (1974); *State v. Kramer,* 45 Wis.2d 20, 30, 171 N.W.2d 919 (1969).

In *McCleary v. State*, 49 Wis.2d 263, 277–278, 182 N.W.2d 512 (1971) this court discussed what the exercise of discretion means.

"In the first place, there must be evidence that discretion was in fact exercised. Discretion is not synonymous with decision-making. Rather, the term contemplates a process of reasoning. *This process must depend on facts that are of record or that are reasonably derived by inference from the record* and a conclusion based on a logical rationale founded upon proper legal standards. As we pointed out in *State v. Hutnik* (1968), 39 Wis.2d 754, 764, 159 N.W.2d 733, '. . . there should be evidence in the record that discretion was in fact exercised and the basis of that exercise of discretion should be set forth.' "

". . . Unless there is evidence that the trial judge has undertaken a reasonable inquiry and examination of the facts as the basis of his decision, his decision will be disregarded by this court. Such a decision on its face shows an abuse of discretion." (Emphasis supplied.)

When the defendant himself moves for a change of venue, he is required to make a proper record from which the trial court and ultimately this court can make a decision or exercise review. Thus, the decision is to be based on "the evidence elicted, properly considered." *State v. Kramer, supra*, 45 Wis.2d at 30; *Ruff v. State, supra*, 65 Wis.2d at 720. What is required is "evidence, not mere allegations." *Garcia v. State*, 73 Wis.2d 174, 190, 242 N.W.2d 919 (1976).

In this case the trial court based its findings regarding prejudicial publicity on its own personal contact with the community and its own informal poll, "without disclosing its identity . . . in shopping centers, restaurants and other public places . . . ."

In *Moore v. Russell*, 294 F. Supp. 615 (E.D. Tenn. 1968), a habeas corpus proceeding, the court found defendant was deprived due process of law when the state

trial court judge denied motions for change of venue and severance without a hearing. At the habeas corpus proceeding the state trial court judge testified it was his "considered judgment that the amount of pre-trial publicity was insufficient to warrant a change of venue." The federal court in its opinion wrote the trial judge

". . . was not authorized to use as evidence his own conceptions of what the facts might be . . . Mr. Moore's chances for a fair trial depended entirely at that moment on the sound exercise of discretion by the trial judge, . . .

"His was an option, but in exercising it he was not permitted to disregard solid and settled principles of law established for the protection of the petitioner and others similarly situated, including the principle of law that the judicial findings and conclusions be founded on legal evidence . . .

"The trial judge has no judicial power as contradistinguished from the power of the law. His discretion is a legal discretion to be exercised in discerning the proper course prescribed by law with the consequent duty to follow that course. His will as a person is not to be done, but rather the will of the law. Osborn v. The Bank of the United States (1824), 9 Wheat. 738, 22 U.S. 738, 6 L. Ed. 204.

"Whatever may have been the personal observations and individual views of the judge as a person, these factors have no place whatever in his exercise of judicial discretion . . ." 294 F. Supp. at 620–621 (citations omitted.)

As noted, approximately eleven months after the order, during consideration of motions after verdict, the court granted the state's motion to add to the record evidence of pre-trial publicity consisting of radio and television news transcripts and newspaper clippings.

In *McCleary*, this court said that when the trial judge fails to set forth his reasons for a decision this court examines the record *ab initio*. Accord, *Roehl v. State*, 77 Wis.2d 398, 419, 253 N.W.2d 210 (1977). This is

consistent with this court's duty, on a change of venue question, to examine the record independently in assessing whether the trial court abused its discretion. *Turner v. State, supra,* 76 Wis.2d at 27; *Jones v. State, supra,* 66 Wis.2d at 109.

But these principles presume this court has a record to rely on. This court's examination of the eleven month late addition to the record, even if revelatory of prejudice, could not reveal whether such prejudice could have been mitigated by means less costly to the defendant than a trial far from his home. Thus, a continuance or extensive voir dire could well have accomplished the trial court's purpose.

Among the factors this court will consider in reviewing a trial court's discretion on a venue question are the amount of difficulty encountered in selecting a jury, the extent to which jurors were familiar with the publicity and the defendant's utilization of challenges, both peremptory and for cause, available to him on voir dire. *Jones v. State,* 66 Wis.2d 105, 109, 223 N.W.2d 889 (1974). These factors cannot be considered by this court because the trial court never attempted to empanel a jury in Milwaukee county.

## II. *INSTRUCTIONS ON MANSLAUGHTER AND SELF-DEFENSE.*

The jury was instructed on the elements of first and second-degree murder. Defendant requested instructions on self-defense,[10] manslaughter: causing death of another unnecessarily in the exercise of self-defense,[11] and manslaughter: heat of passion.[12] The trial court ruled that "the court, upon analysis of the evidence in

---

[10] Sec. 939.48(1); Wis. J I—Criminal 805.

[11] Sec. 940.05(2), Stats., Wis. J I—Criminal 1140.

[12] Sec. 940.05(1), Wis. J I—Criminal 1130.

this case, does not consider that self-defense is an issue." None of these requested instructions or corresponding verdicts were given to the jury.

It is defendant's contention there existed evidence in the record to establish a reasonable ground for acquittal on the charges of first and second-degree murder and a finding of complete self-defense or, alternatively, a conviction for manslaughter.

## A. *Manslaughter—Unreasonable Use Of Force.*

A majority of this court concludes the trial court erred in refusing to instruct the jury on the elements of manslaughter; causing death of another unnecessarily in the exercise of self-defense. There is ample evidence in the record from which a jury could find defendant guilty on two counts of first-degree murder. But it is also clear there was evidence in the record, which, if the jury chose to believe it, could lead to acquittal on those charges and guilty verdicts on manslaughter.

The privilege of self-defense is provided in sec. 939.-48(1), Stats:

"939.48 *Self-Defense And Defense Of Others.* (1) A person is privileged to threaten or intentionally use force against another for the purpose of preventing or terminating what he reasonably believes to be an unlawful interference with his person by such other person. The actor may intentionally use only such force or threat thereof as he reasonably believes is necessary to prevent or terminate the interference. He may not intentionally use force which is intended or likely to cause death or great bodily harm unless he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself."

This section was summarized in *Thomas v. State,* 53 Wis.2d 483, 192 N.W.2d 864 (1972), as follows:

"Force may be used against another to prevent or to terminate what one reasonably believes to be an unlaw-

ful intereference with his person by such other person; but he may only use such force as he reasonably believes is necessary. Before force which is likely to cause death or great bodily harm can be used, one must reasonably believe that such force is necessary to prevent imminent death or great bodily harm to himself." 53 Wis.2d at 487.

In assessing the reasonableness of the defendant's belief the jury must apply an objective standard of the "ordinary intelligent and prudent person . . . 'in the position of the defendant under the circumstances existing at the time of the alleged offense.' " *State v. Kanzelberger,* 28 Wis.2d 652, 660, 137 N.W.2d 419 (1965), *cert. den.* 385 U.S. 867. *Maichle v. Jonovic,* 69 Wis.2d 622, 627, 230 N.W.2d 789 (1975).

The law specially provides for the situation where, under the objective "prudent person" standard, it is found that the deadly force used in the exercise of the self-defense privilege was unreasonable. This has been referred to as the doctrine of imperfect self-defense, *Ross v. State,* 61 Wis.2d 160, 166, 211 N.W.2d 827 (1973), and is set forth in sec. 940.05(2), Stats. as a type of manslaughter.

"940.05 *Manslaughter.* Whoever causes the death of another human being under any of the following circumstances may be imprisoned not more than 10 years:
". . .
"(2) Unnecessarily, in the exercise of his privilege of self-defense or defense of others or the privilege to prevent or terminate the commission of a felony; or . . ."

The standard for putting this "imperfect self-defense" doctrine before the jury was recently discussed in *State v. Johnnies,* 76 Wis.2d 578, 583, 251 N.W.2d 807 (1977):

"To justify the submission of a lesser degree of homicide to the jury there must be a reasonable ground in

the evidence for acquittal on the greater charge and for conviction on the lesser charge. *McAllister v. State,* 74 Wis.2d 246, 253, 246 N.W.2d 511 (1976).

"Therefore, the submission of an instruction on manslaughter would have been proper only if under some reasonable view, the evidence was sufficient to establish that the defendant shot the deceased believing her use of force was necessary in self-defense, but that her belief was unreasonable under the circumstances. *Bedford v. State,* 65 Wis.2d 357, 364, 222 N.W.2d 658 (1974)."[13]

The court has also discussed what is meant by a "reasonable ground" in the evidence.

"As the court stated in *State v. Bergenthal,* 47 Wis.2d 668, 675, 178 N.W.2d 16 (1970), cert. denied, 402 U.S. 972.

" 'The key word in the rule is "reasonable." The rule does not suggest some near automatic inclusion of all lesser but included offenses as additional options to a jury. Only if "under a different, but reasonable view," the evidence is sufficient to establish guilt of the lower degree and also leave a reasonable doubt as to some particular element included in the higher degree but not the lower, should the lesser crime also be submitted to the jury. . . . The purpose of multiple verdicts is to cover situations where under different, but reasonable views of the evidence there are grounds either for conviction of the greater or of the lesser offense. The lesser degree verdict is not to be submitted to the jury unless there exists reasonable grounds for conviction of the lesser offense and acquittal on the greater.' " *Briggs v. State,* 76 Wis.2d 313, 333–334, 251 N.W.2d 12 (1977).

The evidence in the record so viewed, must reveal the person exercising the privilege of self-defense intended

---

[13] As for the necessity of finding in the evidence a reasonable ground for acquittal on the greater charge and conviction on the lesser, *see also, Flores v. State,* 76 Wis.2d 50, 55, 250 N.W.2d 720 (1977); *Garcia v. State,* 73 Wis.2d 174, 186, 242 N.W.2d 919 (1976); *Day v. State,* 55 Wis.2d 756, 759, 201 N.W.2d 42 (1972).

to use force or to threaten to use force against another for the purpose of self-defense. *State v. Johnnies, supra,* 76 Wis.2d at 584. *Thomas v. State, supra,* 53 Wis.2d at 488.

In support of the trial court's refusal to instruct the jury on the "imperfect self-defense" crime of manslaughter, the state argues that "a reasonable view of the totality of the trial testimony demonstrates" that defendant initially was the aggressor and continued in that role during the struggle, resisting lawful arrest and attempting to escape.

But neither the trial court nor this court may, under the law, look to the "totality" of the evidence, as the state invites us to do, in determining whether the instruction was warranted. To do so would require the court to weigh the evidence—accepting one version of facts, rejecting another—and thus invade the province of the jury. *Cf. Flores v. State,* 76 Wis.2d 50, 69, 250 N.W.2d 720 (1977).

Our holding in *Bergenthal, supra,* that an instruction may be submitted only if supported by a "different, but reasonable view" of the evidence was attacked as violative of due process in *Ross v. State,* 61 Wis.2d 160, 211 N.W.2d 827 (1973). The alleged infirmity of the rule was that this reasonable view formulation required the court to invade the province of the jury. But this argument was found without merit because the judge will not weigh the evidence, but determine only whether evidence existed in the record, viewed favorably to the defendant, to warrant the instruction.

"Under these tests, the evidence is to be viewed in the most favorable light it will 'reasonably admit of from the standpoint of the accused.' This test does not call for a weighing of the evidence by the trial judge. He is merely obliged to examine the evidence to determine whether the proposed instruction is based upon

mere conjecture and whether, if a verdict were returned on the lesser included offense, he would be obliged to set it aside. To instruct on the lesser included offense, speaking only to the evidentiary factors revealed at trial and not to the question of included elements, the evidence of the lesser included offense must be relevant and appreciable; and as considered most favorably to the defendant, the inclusion of the instruction must not be unreasonable. The question basically is whether a jury giving the evidence full credence could reasonably return a verdict of guilt on the lesser included offense." 61 Wis.2d at 172–173.

*Accord, Garcia v. State,* 73 Wis.2d 174, 186, 242 N.W.2d 919 (1976).

Thus the question before us, as it was by law before the trial court, is not what the "totality of the evidence" reveals but rather, whether a reasonable construction of the evidence will support the defendant's theory "viewed in the most favorable light it will 'reasonably admit of from the standpoint of the accused.'" *Ross v. State, supra.* If this question is answered affirmatively, then it is for the jury, not for the trial court or this court, to determine whether to believe defendant's version of events.

Defendant testified that he was beaten continually by the two officers; that he had dropped his gun and repeatedly asked them to stop; that he had grabbed the gun which was being used in the beating and intentionally shot them to stop what he characterized as their assault. This testimony was corroborated in part by a state's witness who testified he thought the two officers were going to beat up "the tall Mexican . . . two against one." This evidence could be construed by the jury as showing that defendant was the victim of an unlawful interference with his person by another.

Defendant had no privilege to interfere with an arrest, which may itself require a lawful use of force. But there are circumstances where a police officer's use of force is unlawful. An officer may be guilty of assault and battery if he uses unnecessary and excessive force or acts wantonly and maliciously. 4 Anderson, *Wharton's Criminal Law and Procedure*, sec. 1621, p. 292; *see, McCluskey v. Steinhorst*, 45 Wis.2d 350, 173 N.W.2d 148 (1970) (a civil battery); *also, see, Clark v. Ziedonis*, 368 F. Supp. 544 (E.D. Wis. 1973), aff'd 513 F.2d 79 (1975). This is a jury question. *Wirsing v. Krzeminski*, 61 Wis. 2d 513, 524, 213 N.W.2d 37 (1973).

Even if it were assumed that the defendant initiated the aggression when he pointed his revolver at the officers, it was possible, if the jury so believed, that the defendant regained his privilege of self-defense down the street when he dropped his gun and repeatedly told the officers that they had him and that they should stop beating him indicating that he was thereby submitting to arrest.[14] In *Banks v. State*, 51 Wis.2d 145, 156, 186 N.W.2d 250 (1971) the court quoted Miller, *Criminal Law* (Hornbook Series) sec. 67(g) to amplify this principle:

"As has been previously stated, self-defense is not available as a plea in excuse or justification, to one who was himself the aggressor in the difficulty which resulted in death, or other injury. If, however, after bringing on the difficulty, such a person withdraws, in good faith, and shows his adversary that he does not desire to continue the conflict, but his adversary thereupon pursues him and becomes the aggressor, he has the same

[14] "939.48 *Self-defense And Defense Of Others*. . . . (2) Provocation affects the privilege of self-defense as follows: . . .

"(b) The privilege lost by provocation may be regained if the actor in good faith withdraws from the fight and gives adequate notice thereof to his assailant. . . ."

right to defend himself as if he had not originally provoked the difficulty. . . . If he withdraws and gives his adversary reasonable ground for believing that he has withdrawn, it is sufficient. It is not required of him that he, at all hazards, make it actually known to his antagonist that he has withdrawn; if his acts are such as would notify a reasonable man under the circumstances of the withdrawal that is all that is required of him. If the passion or cowardice of the adversary blind him to the actions of the accused showing his intention to withdraw, this cannot be charged against the accused, so as to deprive him of the right secured by his withdrawal to defend his life. 'If the party assailed has eyes to see he must see, and if he has ears to hear he must hear. He has no right to close his eyes or deaden his ears.' . . ."

While the state advances strong arguments that such withdrawal was inconsistent with defendant's prior conduct, this is an argument properly addressed to the jury. *See, Ruiz v. State,* 75 Wis.2d 230, 234, 249 N.W.2d 277 (1977).

As previously noted, an actor invoking the privilege of self-defense may use only such force as he reasonably believes is necessary to prevent the interference. *Ross v. State,* 61 Wis.2d at 166.

A majority of this court holds that there exists no evidence from which the jury could believe defendant's use of deadly force was reasonable, entitling him to an instruction on complete self-defense. However, a majority also holds that under one reasonable view of the evidence, the jury could conclude that defendant's belief that he could act in self-defense was reasonable. The defendant was thus entitled to have the jury consider his theory of "imperfect self-defense," which is embodied in the crime of manslaughter. Failure to so instruct the jury was error "for which prejudice to

the defendant (was) undeniable." *State v. Stortecky,* 273 Wis. 362, 369, 77 N.W.2d 721 (1956).

B.  *Self-Defense.*

Under sec. 939.48, Stats., defendant was entitled to use deadly force only if he reasonably believed that such force was necessary to prevent imminent death or great bodily harm. The distinguishing factor between man-slaughter and complete self-defense in this case is the reasonableness of defendant's belief deadly force was necessary. Before force which is likely to cause death or great bodily harm can be used, one must reasonably believe that such force is necessary to prevent imminent death or great bodily harm to himself. *Thomas v. State, supra,* 53 Wis.2d at 487.[15] The question of reasonable-ness of a person's actions and beliefs, where a claim of self-defense is asserted, is a question peculiarly within the province of the jury. *Maichle v. Jonovic, supra,* 69 Wis.2d at 630.

A minority of this court including this writer and Justices HEFFERNAN and ABRAHAMSON would therefore hold that the issue of complete self-defense should also have gone to the jury. Applying the objective test of rea-sonableness, the jury could find that a prudent person in the position of the defendant under the circumstances existing at the time could believe that the constant pum-melling about the head by two large men, one of whom used something hard, created the imminent possibility of death or great bodily harm to himself. This is not to suggest that this test accurately states what in fact happened; only that this is one version which a jury could believe.

---

[15] The question is *not* whether such force was actually neces-sary. *Schmidt v. State,* 124 Wis. 516, 519, 102 N.W.2d 1071 (1905); *Miller v. State,* 139 Wis. 57, 76, 119 N.W. 850 (1909).

C. *Manslaughter—Heat Of Passion.*

Defendant also requested and was refused an instruction on manslaughter as defined in sec. 940.05(1), Stats:

"Whoever causes the death of another human being under any of the following circumstances may be imprisoned not more than 10 years:

"(1) Without intent to kill and while in the heat of passion."

In *State v. Hoyt*, 21 Wis.2d 284, 290–291, 128 N.W.2d 645, rehearing (1964) "heat of passion" was explained as follows:

" 'That which will constitute "the heat of passion" which will reduce what would otherwise be murder to manslaughter "is such mental disturbance, caused by reasonable, adequate provocation, as would ordinarily so overcome and dominate or suspend the exercise of the judgment of an ordinary man as to render his mind for the time being deaf to the voice of reason; make him incapable of forming and executing that distinct intent to take human life essential to murder in the first degree; and to cause him, uncontrollably, to act from impelling force of the disturbing cause rather than from any real wickedness of heart or cruelty or recklessness of disposition." *State v. Stortecky* (1956), 273 Wis. 362, 372, 77 N.W. (2d) 721. It has been said that, "the provocation, in order to be sufficient in law, must be such as, naturally and instantly, to produce in the minds of persons, ordinarily constituted, the highest degree of exasperation, rage, anger, sudden resentment, or terror." 21 Am. & Eng. Ency. of Law (2d ed.), p. 177, quoted in *Johnson v. State* (1906), 129 Wis. 146, 159, 108 N.W. 55.' "[16]

---

[16] Also see, *Hayzes v. State*, 64 Wis.2d 189, 196–197, 218 N.W.2d 717 (1974); *Ameen v. State*, 51 Wis.2d 175, 182–183, 186 N.W.2d 206 (1971); *State v. Lucynski*, 48 Wis.2d 232, 234–235, 179 N.W.2d 889 (1970); *Zebrowski v. State*, 50 Wis.2d 715, 728–730, 185 N.W.2d 545 (1971).

In *Brook v. State*, 21 Wis.2d 32, 42–43, 123 N.W.2d 535 (1963), the court explained that with respect to provocation, "the test applied is not the subjective one of whether it was sufficient to produce in defendant said passion as to cause him to kill without intent to do so. Rather it is the objective one of whether the provocation would have caused such state of mind in persons ordinarily constituted."

We find no error in the court's refusal to instruct the jury on the elements of manslaughter-heat of passion. Limited to the record as we are, we find no evidence that defendant's act was other than a deliberate and calculated response to the situation in which he allegedly found himself.

### III. *POLYGRAPH EVIDENCE.*

#### A.

On October 12, 1974, a little more than six months after this court's decision in *State v. Stanislawski,* 62 Wis.2d 730, 216 N.W.2d 8 (1974), the parties stipulated that the defendant would submit to a polygraph examination.[17]

---

[17] The stipulation provided:

"(a) The said examinee shall submit to a polygraph test and said test shall be administered by Robert L. Anderson or Theodore G. Welch, Expert Polygraphists, State of Wisconsin Crime Laboratory Bureau, 4706 University Avenue, Madison, Wisconsin;

"(b) At any trial had herein or any guilty plea proceedings with respect thereto, the graphs resulting from said test and the examiner's opinion thereon concerning the areas covered by the questions attached hereto only shall be admissible at said trial or guilty plea on behalf of either the said examinee or the state subject to the holding in *State v. Stanislawski,* 62 Wis.2d 730, 216 N.W.2d 8 (1974) and the rules of evidence as set forth in

After the defendant was examined by polygraph examiner Robert L. Anderson the trial court conducted a pre-trial hearing on the admissibility of the polygraph evidence, and at the conclusion accepted the stipulation. The opinion of the examiner, as he related it at trial, was that the defendant was untruthful.

*Stanislawski* did not explicitly determine whether a defendant who stipulates to the admission of an examiner's opinion is nevertheless entitled to call his own expert to rebut that opinion. Defendant asserts the court erred in denying him the opportunity to rebut Anderson's evidence with his own experts.

Defendant offered to prove that Robert A. Brisentine, a "senior polygraph examiner" for the Army Criminal Investigation Command, would testify that though examiner Anderson testified he had conducted 600 or 700 polygraph examinations in the Army, he had in fact conducted 125 examinations, three of which were inaccurately scored.

Defendant also offered to prove that some of the test questions were improper, that the scoring system used by Anderson was not an established polygraph method, and that the results, properly interpreted by other experts, did not indicate deception.

After the close of all testimony but before a conference on instructions defendant offered to prove that the previous night a one and one-half hour telephone conversation between Brisentine and Anderson took place in which Anderson acknowledged he had scored the test data improperly and that the only conclusion that could be drawn from the charts was that with respect to four crime issue questions, the results were inconclusive and

Wisconsin Statutes Chapter 901 to 911 inclusive; except that if said polygraphist's opinion is that said graphs as to said examinee are inconclusive or no opinion as to deception, then said opinion shall not be admissible on behalf of either party."

no opinion of deception could be given. The fifth crime issue question was found to be "border line deception."

The district attorney asserted this offer "somewhat overstated the matter" but nevertheless recommended that "justice would best be served" by instructing the jury they should not consider the polygraph evidence.[18] The motion was denied.

We are not here concerned with the merits of the polygraph examination as it was actually given or the method by which test data was interpreted. Rather, we believe the question to be under what circumstances a party may challenge polygraph evidence, the admission of which the party has already stipulated to.

In withdrawing the then-existing prohibition on the use of polygraph evidence in Wisconsin, this court in *Stanislawski* was careful to note that its holding did not mean polygraph evidence would thereafter have "unconditioned admissibility." 62 Wis.2d at 741. Conditions were established to insure that the examination was undertaken voluntarily, that the test was properly administered by a qualified expert and that the results were not used as a substitute for evidence establishing the elements of the crime charged.[19]

It is primarily the responsibility of the trial court to insure that these conditions are complied with. *Stanislawski* held,

---

[18] At an in-chambers conference the district attorney related a conference call between Brisentine, Anderson and himself: ". . . Mr. Anderson expressed the possibility that he was wrong . . . he didn't say, 'I'm wrong,' he didn't say, 'I'm going to recant my testimony,' he said there's a possibility of that and expressed a desire to do some retesting on Sunday, . . . That was enough for me to decide (the polygraph evidence should be excluded.)"

[19] 62 Wis.2d at 742–743; *Accord, State ex rel. Harris v. Schmidt*, 69 Wis.2d 668, 681–682, 230 N.W.2d 890 (1975).

"That notwithstanding the stipulation the admissibility of the test results is subject to the discretion of the trial court, *i.e.*, if the trial judge is not convinced that the examiner is qualified or that the test was conducted under proper conditions he may refuse to accept such evidence." 62 Wis.2d at 742 (citation omitted.)

Although we did not explicitly so state in *Stanislawski*, we now hold that the interests of justice require this judicial inquiry be conducted outside the hearing of the jury.[20]

This admissibility hearing also serves the purpose of controlling the issues which are presented to the jury.

In stipulating to the admissibility of a particular examiner's opinion, the parties are stipulating at least to the basic qualifications of the examiner. But because the stipulation is made before the test is given, it cannot be construed as foreclosing an inquiry into the manner in which the test was given or the sufficiency of the data upon which a particular conclusion is based. We believe that the logical and proper place to make these challenges is at the hearing on admissibility.

The appropriate time to challenge that opinion is at the admissibility hearing. This will serve the purpose of informing the court and at the same time preventing the jury from being distracted by detours into collateral proof on scientific evidence, the fundamental validity of which both parties have already accepted.

Once presented with this evidence, the trial court has the option of admitting the evidence or rejecting it. If

---

[20] "901.04 *Preliminary Questions. . .* (3) *Hearing Of Jury.* Hearings on the admissibility of confessions shall in all cases be conducted out of the hearing of the jury. Hearings on other preliminary matters shall be so conducted when the interests of justice require."

the evidence is admitted, the trial court must continue
to exercise its discretion in preventing the trial from
becoming derailed on collateral issues, while at the same
time allowing sufficient leeway to allow the jury "to
determine what corroborative weight and effect such
(examiner's) testimony should be given." *Stanislawski*,
62 Wis.2d at 743.

Because it is the parties themselves who mutually
agree by stipulation to put the polygraph evidence be-
fore the court in the first instance, we emphasize that
the trial court's control of evidence at trial will be upheld
unless it is found to be clearly an abuse of discretion.

A majority of this court holds that the trial court did
not abuse its discretion in refusing to allow defendant's
experts to testify before the jury. The majority addi-
tionally holds the court did not err in refusing to reopen
the evidence before the jury retired to deliberate but
after the proof was closed. Finally, the court holds that
defendant's expert witnesses may testify before the trial
judge at a new admissibility hearing preceding the new
trial but that such hearing need not be held if, prior
to such hearing, the state and the defendant mutually
withdraw the stipulation to admission of the polygraph
evidence.

## B.

A minority of this court, including this writer and
Justices HEFFERNAN and ABRAHAMSON would depart from
the majority opinion insofar as it holds the trial court
did not abuse its discretion and would hold the trial court
did abuse its discretion in refusing to allow defendant
to call expert witnesses to impeach the examiner's opin-
ion and further erred in refusing to reopen the evidence
after the proof was closed.

*Stanislawski* approved the use of polygraph evidence largely because it was found to be comparable in reliability to other types of evidence admitted in the form of expert opinion. 62 Wis.2d at 738–740. As a general rule, a party may offer conflicting evidence through other experts even if the other party's expert is well qualified. The issue then becomes one of weight of testimony and credibility of witnesses, for the trier of fact. *Milbauer v. Transport Employes' Mut. B. Soc.*, 56 Wis.2d 860, 867, 203 N.W.2d 135 (1973). And though defendant stipulated to the admission of the examiner's conclusions, a party who submits the opinions of one expert is not thereby barred from offering conflicting evidence on the part of other experts. *Cedarburg Light & W. v. Allis-Chalmers,* 33 Wis.2d 560, 568, 148 N.W.2d 13 (1967), *reh. den.* 149 N.W.2d 661.

These principles of general application to expert testimony should be applicable here. The state's complaint that such testimony may lead to a battle of experts may be true. But this problem is present in every area of expert testimony and the best solution is the discerning judgment of the jury. The trial court may exercise its discretion vigorously to prevent cumulative testimony or digressions. A court may, in addition, excuse the jury at any time and reassert its prerogative to take evidence and exercise its discretion to exclude the polygraph evidence entirely. But where, as here, the offer of extrinsic evidence goes to the heart of the issue of whether the examination was properly administered and the data properly interpreted, a minority of this court would hold the proponent of such evidence must be given some latitude.

Before the jury retired to deliberate but after the proof had closed defendant offered to prove that Mr. Anderson admitted error in his scoring. At the same hearing at which this offer was made, the district at-

torney moved to instruct the jury to disregard the polygraph evidence.

A minority of this court would further hold failure to reopen the evidence under circumstances such as these, where even the proponent of the evidence (the district attorney) has lost confidence in its reliability, was prejudicial error.

On appeal the state argues, *inter alia,* that reopening the polygraph testimony was likely to give it undue weight in the eyes of the jury. But the trial court has satisfied us this testimony already was heavily felt. In denying the *district attorney's* request to instruct the jury to disregard the polygraph testimony the trial court said,

"(A) large segment of the pie of evidence concerns itself solely with the issue, so much so as in my view to be inextricable by any instruction from the court to the jury to disregard such testimony on the polygraph instrument."

Considering the admittedly prominent role of the polygraph testimony and the fact that the jury had not yet begun its deliberations, the trial court should have allowed defendant's expert (who was then present in court) to testify.

## IV.  *EVIDENCE OF OFFICERS' INTOXICATION.*

We find no error in the trial court's rulings restricting the testimony of defendant's pathologist regarding her opinion on the behavioral effects of alcohol or in its refusal to instruct the jury on the elements of sec. 885.-235, Stats.

Defendant made no offer of proof with respect to the pathologist's opinion when the court ruled on the objection to her testimony. Consequently, we could not

hold even an erroneous exclusion of evidence prejudicial. *State v. Bailey,* 54 Wis.2d 679, n. 1, 196 N.W.2d 664 (1972) ; *State v. Hoffman,* 58 Wis.2d 21, 24, 205 N.W.2d 386 (1973) ; *Deja v. State,* 43 Wis.2d 488, 492, 168 N.W. 2d 856 (1969).

The court refused to instruct the jury on the statutory presumption of sec. 885.235, Stats.[21]

We do not reach the question whether this statutory presumption is applicable to show the intoxication of a victim as part of defendant's theory of self-defense. Without considering this question, we note that sec. 885.235(1)(c) requires corroborating physical evidence of intoxication to supplement the statutory presumption. Because we find no such corroborative evidence of actual intoxication in the record, we hold the trial court's ruling the statutory presumption would have confused the issues and misled the jury was entirely proper.

*By the Court.*—Judgment and orders reversed and cause remanded for a new trial.

[21] "885.235 *Chemical Tests For Intoxication.* (1) In any action or proceeding in which it is material to prove that a person was under the influence of an intoxicant when operating or driving a motor vehicle, or while handling a firearm, evidence of the amount of alcohol in such person's blood at the time in question as shown by chemical analysis of a sample of his breath, blood or urine is admissible on the issue of whether he was under the influence of an intoxicant if such sample was taken within 2 hours after the event to be proved. Such chemical analysis shall be given effect as follows without requiring any expert testimony as to its effect:

". . .

"(c) The fact that the analysis shows that there was 0.1% or more by weight of alcohol in the person's blood is prima facie evidence that he was under the influence of an intoxicant, but shall not, without corroborating physical evidence thereof, be sufficient upon which to find the person guilty of being under the influence of intoxicants."

ROBERT W. HANSEN *(dissenting)*. Two Milwaukee police officers are dead—both killed when they cornered a fleeing gunman who had earlier threatened to blow their heads off with the loaded revolver he leveled at them.

Both law officers were slain with bullets from the pistol of one of the officers, which the defendant had wrested from the officer during the struggle which followed the pursuit and attempted apprehension of the gunman.

Their killer, defendant James Ray Mendoza, was found guilty by a jury on two counts of first-degree murder (sec. 940.01, Stats.)—on one count for the intentional killing of Police Officer Robert Riley and on the second count for the intentional killing of Police Officer Thomas Matulis.

On appeal defendant claims the following: (1) That he was entitled to kill the two police officers in the exercise of the privilege of self-defense; (2) that the trial court erred in transferring the case for trial to another county to assure an impartial jury; and (3) that the trial court erred in not permitting defense counsel to impeach the results of a polygraph test to which defendant had stipulated—given by the polygraph examiner designated by defendant. Each claim of trial court error will be separately discussed.

## I. *SELF-DEFENSE?*

Up to a point, what happened here follows the scenario of the traditional western movie depicting the lawlessness of frontier days. In those movies the town marshal proceeded often to investigate the sounds of gunfire. (In the case before us, two off-duty police officers proceeded—as was their duty—to investigate a shot that was fired.) In the films the gun-toting source of the disorder never meekly surrendered to the sheriff or mar-

shal. (Here, when asked why he fired his gun, the defendant pointed the gun at the law officers and threatened to blow their heads off.)

On film, if he did not then and there shoot it out with the marshal, the pistol-toter would flee the scene, gun in hand. (Here the defendant, keeping his revolver leveled at the officers, began such flight to avoid arrest.) In the celluloid version, despite the risk involved, the sheriff or marshal always set off in pursuit. (In the case here, the two unarmed police officers followed the escaping gunman, one officer stopping at his car to get his service revolver.) In the movies the sheriff would fire a warning shot and order the fleeing gunman to stop and surrender. (Here the two officers—admittedly believed by the defendant to be policemen—ordered the defendant to stop, but they did not shoot and defendant did not stop.)

At the movies, while there might be an earlier exchange of gunshots, the chase ended with punches thrown in a hand-to-hand struggle between the marshal and the fleeing gunman. (Here the two officers caught up with the defendant between two parked cars, and there was an ensuing struggle. The defendant testified that he was struck by the officers while he was disarmed and after he rearmed himself.)

At this point the similarity between what happened in the western movies and what happened here ends. In the films justice always prevailed when the gunman who sought to escape was overpowered and arrested. Justice had prevailed. In the case before us, the gunman prevailed and after killing two police officers, was free to resume his flight. Defendant claims he was entitled to shoot the two police officers in the exercise of the privilege of self-defense (sec. 939.48(1), Stats.).

As grounds for this privilege defendant contends the officers continued to hit him both after he had discarded his pistol during the ensuing struggle between

the two parked cars and after he acquired the gun of one of the officers. Three Justices of this court (JJ. HEFFERNAN, DAY and ABRAHAMSON) agree that a jury could acquit this defendant under these circumstances and could find a lawful exercise of the right of self-defense under sec. 939.48(1), Stats. One Justice (C.J. BEILFUSS) finds acquittal for having acted in self-defense not appropriate, but manslaughter—causing the death of another by the unreasonable exercise of the privilege of self-defense (sec. 940.05, Stats.) an optional verdict a jury might return. Three Justices (the writer, and JJ. HANLEY and CONNOR T. HANSEN) would hold the privilege of self-defense under the statute not here applicable for the three following reasons:

1. *There was here no "unlawful interference," as the statute requires (sec. 939.48(1), Stats.), with the person of the defendant by the arresting officers.* When the defendant earlier pointed his loaded revolver at the police officers and threatened to blow their heads off, they had probable cause to arrest him for the felony crime of endangering safety by conduct regardless of life. *See,* sec. 941.30, Stats.; *State v. Kuta,* 68 Wis.2d 641, 648, 229 N.W.2d 580 (1975), this court holding defendant there "endangered the safety of the police officers by pointing a loaded gun at them."

In the present case, when the defendant began his escape with his loaded gun pointed at the officers, the officers were lawfully entitled to pursue to disarm and arrest the defendant. When the officers ordered defendant to stop and surrender, they were lawfully entitled so to do. (They identified themselves as police officers, and the defendant testified he believed them to be police officers.) When the defendant did not stop but rather continued his flight, the officers were lawfully entitled to use force, even deadly force under these circumstances, to prevent the escape of the armed and danger-

ous fugitive. *See,* 5 Am. Jur.2d, *Arrest,* sec. 84, at 771–773.

When the armed gunman who had earlier threatened their lives continued to flee, the pursuing officers could have shot to prevent his flight and escape. They did not do so, and both are dead for their forbearance. For, moments later, after the defendant had rearmed himself with the gun of one of the officers, as he testified, ". . . I pointed it towards where the punches were coming from, I shot one, I turned it towards the back of me and I shot again." Because they punched when they could have shot this defendant, two officers are dead.

When the officer shouted, "Stop, we're police officers," the defendant testified that "he was right behind me," and "I turned around and I grabbed my .22 caliber and put it between my pants." It was then, "as I started to run," the defendant testified, "one of them grabbed me and turned me around. . . . [A]s I turned around to face them they started hitting me." Confronting a still armed and still dangerous antagonist, who had minutes earlier threatened to blow their heads off with the gun he still had in his waistbelt, the two officers were lawfully entitled to knock the defendant out so that his hand could not travel the few inches to his waistbelt to get and use his loaded gun. It was then, and only then, according to the defendant's own testimony, that "as they were hitting me I got my .22 out, and I threw it away."

When, according to his testimony, the defendant reached in his waistbelt to get his gun during the scuffle, the officer with the service revolver certainly could have—if he observed the reaching—shot the defendant to prevent defendant's hand traveling to his gun. The officer was not required to wait and ascertain the use to which the retrieved weapon was to be put. If the officers did not observe the reaching and the discarding of the gun, they were, on the information known to them, still facing an armed and dangerous antagonist.

Even if they knew that a weapon had been discarded, they had no reason to assume that the defendant was then and thus completely disarmed. That is, the desperado carrying two guns—or gun and knife—did not vanish with the passing of the western frontier. The general test of police action, our nation's highest court has held, is whether the officer "acted reasonably in such circumstances." *Terry v. Ohio,* 392 U.S. 1, 27 (1968). By this test, under these circumstances, the conduct of the two police officers here, from their pursuit of an armed gunman to their attempted capture of him without shooting him, was, as a matter of law, entirely reasonable.

In point of fact, the course they pursued of grappling with the defendant instead of shooting at him was less lethal and more considerate of the life of the defendant than the deadly force they could have used. When this defendant refused to stop when ordered so to do and when he reached for his waistbelt to get his loaded pistol, the officer, then at close range, could have pulled the trigger on his police revolver. He would have been lawfully entitled so to do.

But he did not shoot. From start to finish the arresting officers here were engaged in a continuing single-purpose endeavor to arrest this defendant without using their gun to shoot him. Given this single-purpose endeavor—to arrest the gunman who had threatened their lives—the trial court was entitled to find that pursuit of this goal by these officers could not be held to constitute "the unlawful interference with his person"— which defendant was required to have a reasonable basis to believe existed before there could be a creation or restoration of a right to "intentionally use force against another" in the exercise of self-defense in this state. (Sec. 939.48 (1), Stats.)

2. *Under any view of the evidence in this record, this defendant, if ever he had it, early lost and never re-*

*gained the privilege of acting in self-defense against these arresting officers.* The three Justices of this court (JJ. HEFFERNAN, DAY and ABRAHAMSON) who would affirm an acquittal on the basis of having acted in self-defense do not deny that this defendant lost the right to act in self-defense when he pointed his loaded revolver at the two police officers and threatened to blow their heads off. That he did lose such privilege is clear. Our court has held that self-defense is a privilege, not available, for example, to an armed robber with revolver in hand who when shot at by an intended victim shoots back to prevent himself from being killed. *See, Ruff v. State,* 65 Wis.2d 713, 724, 223 N.W.2d 446 (1974).

The three Justices who would affirm an acquittal (JJ. HEFFERNAN, DAY and ABRAHAMSON) and one Justice (C.J. BEILFUSS) who would see only "imperfect self-defense" as an available jury option (under sec. 940.05, Stats., *Manslaughter*), do hold that it was here possible ". . . that the defendant regained his privilege of self-defense down the street when he dropped his gun and repeatedly told the officers that they had him and that they should stop beating him indicating that he was thereby submitting to arrest."

The majority refers to the statute which provides that the privilege of self-defense ". . . lost by provocation may be regained if the actor in good faith withdraws from the fight and gives adequate notice thereof to his assailant. . . ." (Sec. 939.48(2)(b), Stats.) The majority does not see the lost privilege regained at any time when the defendant fled the pursuing officers, not even at the point in time when they cornered him between two parked cars and, according to his testimony, began hitting and striking him with a hard object. Instead, they see such regaining as accomplished during the scuffle between the officers and defendant after they caught up to him. The majority finds the precise

moment of regaining the privilege, accepting the defendant's testimony, to be when the defendant reached in his waistbelt, got his gun and tossed it on the ground because ". . . I didn't want them to catch me with a gun on my person."

Earlier we have dealt with the complete absence of evidence that either officer observed the discarding of an object by defendant or should have known that the loaded gun was being discarded or could have known that the defendant was, by the discard, rendered completely unarmed. The discard could as easily have been a decoy as a disarming. Self-defense and manslaughter by unnecessary force in the exercise of self-defense are affirmative defenses, with the burden of establishing the right to the privilege upon the defendant. *See,* sec. 972.11, Stats. *See also, Patterson v. New York,* — U.S. —, 97 S. Ct. 2319, 53 L. Ed.2d 281 (1977).

If the mid-scuffle discard of a gun can be held to be a "good faith" withdrawal, can it be held here to have been accompanied by the "adequate notice" of withdrawal to the arresting officers which the statute requires? (Sec. 939.48 (2) (b), Stats.) To term the claimed discard of a weapon as a "good faith" withdrawal "from the fight," as the statute puts it, the majority is required to separate each second of the chase of the armed gunman by the police into a separate occurrence, each moment to be considered in isolation from what went before.

One moment these officers are struggling with an armed and dangerous fugitive. The next moment they are hitting a disarmed and no-longer-dangerous adversary. Reality is not thus segmentable. Events here are beads on a single string, no one moment to be taken from the string as if nothing preceded it. At a risk of their lives that was apparent, and with a loss of their lives that was consequent, two law officers here set

out after an armed and dangerous fugitive who had just pointed his gun at them and threatened to blow their heads off. The police officers cornered the fugitive between two parked cars, and hit and struck him to prevent his getting and using his gun. In the middle of that struggle, after the officers had grappled with the defendant, the defendant said he reached for his gun and discarded it.

With no evidence that the officers observed or knew that a gun had been tossed to the ground, and no assurance that it was this defendant's only weapon, the majority extracts this moment in time and accepts the defendant's argument that, at this precise moment during the scuffle, the defendant had in "good faith" withdrawn from the struggle and had given "adequate notice" of his so doing to the officers. What the majority accepts as a change of status of this defendant was no more than a moment-long interruption of his escaping—the flight which he resumed as soon as he shot the two law officers.

At best, if the officers did observe the mid-struggle discard of a weapon, they had but seconds to consider and decide if their adversary was no longer armed and dangerous. They had risked widowing their wives and orphaning their children by grappling with an armed and dangerous fugitive instead of using a gun to subdue him. They were not required to increase that risk by concluding that the discarding of an object or the statements made by the defendant ended their danger. The discarding of the gun could as easily be a ruse as a reassurance.

The writer, joined by colleagues JJ. HANLEY and CONNOR T. HANSEN, would find here no "good faith" withdrawal, holding instead that the two officers were not at any point in time in these circumstances required to view or treat this defendant as other than a dangerous

antagonist who by threats and acts had established that he intended harm to them and escape for himself. Additionally, we would find no basis for the jury or for the majority of this court to find that by a mid-scuffle discard of a gun this defendant had given "adequate notice" to the police officers of his "good faith" withdrawal so as to entitle him, seconds later, to shoot and kill both officers and claim to have done so in self-defense. *See,* sec. 939.48(1)(b), Stats.

3. *At the time this defendant shot and killed two police officers, knowing them to be such, no reasonable basis existed for his believing that he was in imminent danger of death or great bodily harm.* The self-defense statute provides that a person engaged in "unlawful conduct" provoking an attack "is not entitled to claim the privilege of self-defense against such attack" except when the attack which ensues is of a type causing him "to reasonably believe that he is in imminent danger of death or great bodily harm." (Sec. 939.48(2)(a), Stats.) In this record there is no basis for finding a jury question as to whether this defendant, when he twice pulled the trigger, acted in self-defense or acted ". . . believing that his act was necessary in self-defense but his belief was unreasonable under the circumstances." *Day v. State,* 55 Wis.2d 756, 760, 201 N.W.2d 42 (1972).

Earlier, after the officers had cornered the defendant between two parked cars, the defendant testified that he "felt the hands over my head going with blows, and I grabbed one hand and I held it against the hood." Defendant also stated that he saw a gun, presumably being used as a nightstick, in the hand of one of the officers and that he "got the gun away from this person." With the policeman's service revolver in his possession, the defendant testified that he "pointed it towards where the punches were coming from, I shot one, I turned it towards the back of me and I shot again." Defendant also testified that after he wrested the revolver from

the police officer, "I heard one of them say, he got the gun."

So we have, if defendant's testimony is believed, the situation where police officers are punching at a fugitive they know is rearmed with a gun, and the person with the gun is responding by intentionally shooting, first "where the punches were coming from" and then turning and shooting again.

Can such exchanging of bullets for punches by one whose "unlawful conduct" provoked the struggle be justified as an exercise of the privilege of self-defense, albeit an unreasonable exercise? The majority cites two Wisconsin civil battery cases for the proposition that a police officer may be liable for assault and battery if he "uses unnecessary and excessive force."

*See, McCluskey v. Steinhorst*, 45 Wis.2d 350, 173 N.W. 2d 148 (1970), and *Wirsing v. Krzeminski*, 61 Wis.2d 513, 524, 213 N.W.2d 37 (1973).

That is true enough, but such rule applies awkwardly to police officers both pursuing an armed gunman who has threatened their lives and confronting a rearmed and dangerous subject of lawful arrest. Not only is the "interference with the person" of the armed gunman here not unlawful, but a once armed and then rearmed gunman cannot in self-defense shoot and kill the law officer who throws a punch in seeking to place such gunman under arrest.

Punches thrown at the provoker of an attack do not warrant a response with bullets, for such punches do not create a reasonable basis for fear of imminent death or great bodily harm. Where a defendant reached across a counter and hit a storekeeper with a wrench, our court held the blow struck, as a matter of law, did not constitute an assault with intent to do great bodily harm. *State v. Bronston*, 7 Wis.2d 627, 633, 97 N.W.2d 504, 98 N.W.2d 468 (1959). In commenting on the *Bronston Case*, this court recently stated: "[T]he relatively minor

injuries sustained by the victim in *Bronston* were not in the same category or of the same kind as the enumerated injuries which created a high probability of death, permanent disfigurement, or the loss or impairment of an organ or bodily function." *See, La Barge v. State,* 74 Wis.2d 327, 331, 246 N.W.2d 794 (1972), reversing *Bronston* in another particular, but saying of the above conclusion: "There is no disagreement with the conclusion the court reached in *Bronston.*"

In *Bronston,* the "relatively minor injuries" consisted of a two-inch laceration of the scalp, requiring four sutures to close. In the case before us, the similarly "relatively minor injuries" consisted of a single two-millimeter cut on the head, which defendant's own medical witness described as being "very superficial." While there were "very superficial" and "relatively minor" injuries in both cases, one does not need the wrench-involved *Bronston* holding to find no basis for this defendant having acted to avoid death or great bodily harm when he shot "where the punches were coming from."

At no time in his testimony did defendant state in any fashion, directly or indirectly, that he believed he was in danger of death or great bodily harm. The forbearance of the officers in not shooting him when they had the gun (which he eventually wrested from them) was reassuring on that score. With the balance of power in his hands he had no reason to fear death or great bodily harm. Here when he rearmed himself, the defendant shot twice and killed twice, not to avoid death or great bodily harm but to continue his escape and avoid arrest.

When asked why he did not run away when cornered, defendant answered, "I couldn't." When asked what he did right after he shot the officers, defendant answered, "I started running north." (Incidentally, taking the gun with him.) The defendant's continuing purpose was to flee arrest and the sole purpose of the officers was to prevent such escape. Accordingly, there is in this record

—including defendant's testimony—no reasonable basis upon which a jury could conclude that this defendant believed his twice firing the gun was an act necessary to prevent his death or serious bodily harm, as required by the self-defense statute to legally justify or mitigate his killing of the two officers. (Sec. 939.48(2)(b), Stats.)

For the three reasons given, (1) no unlawful interference by the officers, (2) no regaining of the privilege of self-defense by the defendant, and (3) no reasonable basis for his having acted in fear of death or great bodily harm (and with each reason in itself sufficient for affirmance), the writer, joined by JJ. HANLEY and CONNOR T. HANSEN, would affirm the trial court's refusal to submit as optional verdicts to the jury, instructions relating to acquittal on grounds of self-defense (sec. 939.48, Stats.) or manslaughter by an unreasonable exercise of self-defense (sec. 940.05, Stats.).

## II. *CHANGE OF VENUE?*

Additionally, defendant claims he was denied constitutional and statutory rights by the trial court's order changing the place of trial from Milwaukee to Sparta in Monroe county. The constitutional reference is twofold: (1) To art. I, sec. 7 of the Wisconsin Constitution, requiring trial of criminal defendants "by an impartial jury of the county or district wherein the offense shall have been committed; which county or district shall have been previously ascertained by law," and (2) to amend. VI of the United States Constitution guaranteeing the defendant a trial "by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law."

Defendant contends these provisions give him an absolute right to trial by a jury of the county or district in which the offense with which he is charged is alleged to

have been committed. But what if a fair trial by an impartial jury cannot be had in the county or district in which the crime was committed? If such be the situation, and if the defendant moves for change of venue or change in place of trial to another county or district, that motion must be granted by the trial court. Sec. 261.04, Stats.

But what if the defendant makes no such request or motion? Can the trial court, after finding that a fair trial by impartial jury cannot be had in the county or district where the crime was committed, transfer sua sponte the place of trial to another county or district where a fair trial by impartial jury can be had?

In such case of crunch the choice is twofold. Either the mandate for fair trial by impartial jury must prevail, or the requirement for trial in the county or district where the crime was committed must be given priority. Obviously, one mandate must give way to the other. The only alternative would be to hold that, where a fair trial cannot be had in the county or district in which the crime was committed, no trial can be held anywhere unless defendant requests a transfer of the case. Not many such requests or motions would be made by defendants if the consequence of not making the request was dismissal of the proceedings.

In determining the priorities in this situation, one ought start with the primary purpose and nature of the constitutional protection of the nearly identical federal and state constitutional provisions involved. We see the goal sought as the right to a fair trial by an impartial jury in the county or district where the crime was committed. To go beyond that to hold there is an absolute and unlimited right of a defendant to trial in the county or district where the crime was committed—regardless of fairness of the trial or impartiality of the jury—makes no sense at all.

An unfair trial other than by an impartial jury is no trial at all. Where the crunch is between the fairness and the locality of the trial, fairness is not to yield to locality. As one state court has held: "[I]t is the right of trial by an *impartial jury in the county* in which the offense is alleged to have been committed that is preserved rather than the absolute right *to a trial in the county.*" [Emphasis in original.] *State v. Patterson,* 64 Ariz. 40, 165 P.2d 309, 313 (1946).

Or as the same court put it: "The right of a defendant to a trial by jury in the county where the crime is alleged to have been committed is conditioned upon the possibility of empaneling 'an impartial jury' in that county. . . ." *Mast v. Superior Court,* 102 Ariz. 225, 427 P.2d 917, 918 (1967). The conclusion follows that the right to trial in a particular county or district is contingent upon the possibility of finding an impartial jury to conduct a fair trial in such county or district.

Thus holding the federal and state constitutional mandate to be primarily an assurance of a fair trial by an impartial jury—to be held where possible in the county or district where the crime was committed—the requirement of a shift for fairness becomes more than a "strategic choice" of the defendant at bar. It becomes an affirmative duty of the trial court to order the change of place of trial where a fair trial cannot be had in the county or district of vicinage. As this court has held: "[A] trial court should act on its own motion when confronted with aggravated circumstances from which it appears that a jury's dispassionate evaluation of the evidence is rendered doubtful because of the pressure of publicity surrounding a case." *State v. Dean,* 67 Wis. 2d 513, 526, 227 N.W.2d 712 (1975).

As this court earlier held as to change of venue to assure a fair trial: "[I]n some cases the court may be required to act sua sponte." *McKissick v. State,* 49 Wis.

2d 537, 545, 182 N.W.2d 282 (1971). Earlier our court has held that: "[U]nder proper circumstances a trial court has an affirmative duty to take steps to protect the right of a defendant to a fair trial." *State v. Alfonsi,* 33 Wis.2d 469, 480, 147 N.W.2d 550 (1967), quoting *Sheppard v. Maxwell,* 384 U.S. 361 (1966), the high court holding, "Due process requires that the accused receive a trial by an impartial jury free from outside influences."

The majority opinion notes that in the above noted and quoted cases the defendant did not object to the change in place of trial to another county. That is correct, but that fact neither dilutes nor waters down the mandate given trial court judges in this state to sua sponte make certain that a fair trial with an impartial jury can be held in the county in which the crime was committed.

Had this court intended to subject the affirmative duty placed on trial courts to assure fairness of trial proceedings to assent by the defendant, it could and would have said so. The ringing words of the *Dean* decision that "a trial court should act on its own motion when confronted by aggravated circumstances" (67 Wis.2d at 526) as to fairness of trial in the county of the crime now have added the exception "unless the defendant objects." That makes a matter of "strategic choice" of a defendant what, up to now, was a constitutional imperative to assure the fairness of the trial. In opting for the right of a defendant to insist upon a less-than-fair trial before a less-than-impartial jury, the majority points out that a change of venue or place of trial is only "one method of guaranteeing a fair trial; others are voir dire and continuance." Citing *McKissick v. State,* 49 Wis.2d 537, 182 N.W.2d 282, 286 (1971).

It is true that, in addition to changing the place of trial, there is the possibility of continuance until pub-

licity abates or the exclusion on voir dire of prospective jurors who are in effect prejudiced. The "affirmative duty" placed upon trial courts where fairness of trial is involved requires consideration of the alternatives and—in the sound exercise of judicial discretion—determining the appropriate alternative to choose.

This is what the trial court did in the instant case, after waiting until one month before the trial date to decide between the available alternatives. While defense counsel registered numerous objections to the order when issued, no earlier request for an evidentiary hearing on the matter of whether a fair trial could be held in Milwaukee county was made by defendant, so we would not find any denial of a meaningful opportunity to be heard on the venue issue. Both state and defense in criminal cases are on notice that a trial court in this state has the affirmative duty to remove doubts as to the fairness of a trial held in the county of commission of the crime.

In the case before us, the trial judge carefully and in detail set forth the matters he had considered before ordering a change of venue to another county. The standard of measurement was stated to be "a reasonable likelihood that pretrial publicity has prejudiced the right of the defendant to a fair trial." As a frame of reference, the trial judge listed the factors the court considered, including "the nature and character of the publicity or information involved; the degree to which the publicity has permeated the area of the jury sources; that is, the intensity and coverage of that information; the timing and specificity of the publicity."

The trial judge further detailed matters such as the publicity from the time of the offense in the local news media, the necessity to move the preliminary hearing to larger quarters to accommodate spectators, and the repetitive coverage of testimony and extra-judicial statements of witnesses in the news media. He concluded that there

existed in the community of Milwaukee "a climate of prejudice under the reasonable probability rule." Rejecting as inadequate alternatives such as granting of further adjournment, use of voir dire, and sequestration of the jury, the trial court found that changing the place of trial was required to insure a fair trial by an impartial jury.

While the final check by the trial judge—made by visiting places of community assembly to determine community reaction to pretrial publicity—can be faulted, it was here no more than an effort to determine if the passage of time had abated the climate or prejudice and prejudgment, and, at the least indicated, as did his order and findings, the thoughtful care and careful consideration he gave to the matter of resolving doubts as to whether a fair trial could be conducted in Milwaukee county. The exercise of discretion as to place of trial was thus thoughtful, prudent and proper.

## III. *POLYGRAPH EVIDENCE?*

Finally, defendant argues the trial court erred in not permitting defense counsel to call to the witness stand expert witnesses to impeach the testimony of the polygraph examiner who, by stipulation of the parties, conducted a deception response test as to defendant's answers to certain questions. With the results of such testing adverse to the interests of his client, defense counsel sought to contest the qualifications of the agreed-to examiner and to impeach the results of the testing and the procedure followed.

The majority of this court finds no ground for reversal in the trial court's refusal to permit, beyond cross-examination, the impeachment of the testimony of the polygraph examiner to which the parties had earlier stipulated. The parties—prosecution and defense—had stipulated that the results of the polygraph testing by the

designated polygraph examiner would be admissible "subject to the holding in *State v. Stanislawski* [62 Wis.2d 730, 216 N.W.2d 8 (1974)]" The trial judge followed the *Stanislawski*-prescribed procedure, and is not to be faulted for following the limits set in that holding of this court, exactly as provided for in the stipulation of the parties here.

Actually, in the case before us, it was the defendant through his counsel who initially filed a motion for admission of the results of the polygraph examination, asserting in such motion that he was "willing to undergo a polygraph examination at the Wisconsin Crime Laboratory by Mr. Robert L. Anderson, Chief Polygraph Examiner." In that motion defendant demanded that the results of the polygraph examination to be conducted by Mr. Anderson be admitted at time of trial whether the state consented or not. However, since *Stanislawski* requires an advance stipulation as to admissibility by both prosecution and defendant, the trial court properly denied such motion.

At the time of the hearing on the motion the defendant identified Mr. Robert Anderson, who subsequently administered the test here given, as "the most outstanding polygraph examiner in the midwest." After the denial of defendant's motion for admissibility of a test to be given by Mr. Anderson, defendant and the prosecution entered into a stipulation that a polygraph test would be given to defendant by Mr. Anderson. Following this stipulation, the trial court approved the testing and, subject to the conditions of *Stanislawski*, admitted the results of the test into evidence.

The stipulation of the parties as to the polygraph test and who was to conduct it was subject to *Stanislawski*, which allows admission of polygraph evidence under the following limited conditions: "(1) only for impeachment or corroboration, on the question of credibility; (2)

where there is a stipulation of prosecutor and defense counsel, and consent of the party involved, to the taking of the test and the admissibility of its results; and (3) with the trial court retaining the right to reject the proffered testimony if not convinced that the examiner is qualified and that the test was conducted under proper conditions." *Id.* at 741.

If the trial judge is not convinced the examiner is qualified or the test was conducted under proper conditions, the trial court may refuse to accept the polygraph evidence. *Id.* at 742. The right of the opposing party to cross-examine the examiner is limited by *Stanislawski* to "(a) the examiner's qualifications and training; (b) the conditions under which the test was administered; (c) the limitations of and possibilities for error in the technique of polygraphic interrogation; and (d) at the discretion of the trial court, any other matters deemed pertinent to the inquiry." *Id.* at 743.

In the case before us, defense counsel sought to go beyond such cross-examination to introduce the testimony of other expert witnesses to impeach the polygraph examiner—earlier stipulated to by him—and such examiner's opinion. That goes beyond the dictates of *Stanislawski* which set forth not only the preconditions for admissibility, but the limit and extent of efforts to impeach the testimony of the polygraph examiner. The offering of additional testimony through other experts, either for impeachment or corroboration, was not included within the parameters of *Stanislawski*.

While finding no reason for reversal in the procedure followed by the trial court in this case, pursuant to *Stanislawski,* a majority of this court interprets *Stanislawski* to permit a mid-trial review of the matter of admissibility of polygraph testimony. Such authority to review the matter of admissibility makes the stipulation of the parties a nonconditional one, not retractable when-

ever the results of the test turn out to be adverse to one or the other of the parties joining in the stipulation. Instead, it makes the court ruling as to admissibility subsequently reviewable by the trial court at any time before the polygraph test results are admitted into evidence.

Such court review is to be at a hearing before the court, not the jury, and is to be limited solely to the question of admissibility. So limited, it should be clear that it must be held before, not after, the polygraph examiner takes the stand or the outcome of his testing is presented to the jury. The writer agrees that this provision for court reconsideration of its ruling on admissibility implements, but does not do violence to the *Stanislawski* rule that "notwithstanding the stipulation the admissibility of the test results is subject to the discretion of the trial court, *i.e.*, if the trial judge is not convinced that the examiner is qualified or that the test was conducted under proper conditions he may refuse to accept such evidence." *Id.* at 742.

Three Justices of this court (JJ. HEFFERNAN, DAY and ABRAHAMSON) would go further to permit a defendant, disadvantaged by the results of a polygraph examiner to which he earlier stipulated, to "call expert witnesses to impeach the examiner's opinion." This would make the presenting of polygraph testimony identical with other types of expert testimony, such as that of psychiatrists called by state and defense to testify in "not guilty by reason of insanity" trials. This, the three Justices concede, would lead to a "battle of experts."

That is the kindest possible description of the parade of state and defense psychiatrists to the witness box, each whistling the tune of the side which calls them to the stand. One need not be a cynic to observe that it seems the side that pays the fiddler calls the tune. We need not and do not here debate what such "battle of experts" contributes to a "search for the truth" in criminal cases.

But what is puzzling about the three Justices' suggestion is that it is made as an addendum to the *Stanislawski* procedure, when in fact it appears to be a substitute for it. If polygraphy testimony is to be admitted pursuant to "principles of general application to expert testimony," as the three Justices suggest, what then is the purpose of the *Stanislawski* insistence upon advance stipulation of the parties and prior court approval to the admissibility of such polygraphy test results? Certainly, "principles of general application to expert testimony" do not include any requirement for advance stipulation of the parties and advance concurrence of the trial court as to admissibility of such expert testimony.

What is equally puzzling is to have the district attorney here—who stipulated to the admissibility of polygraph test results and joined in naming the examiner to conduct such testing—argue on this appeal that polygraphy testimony ought not be permitted in this state, even where the parties stipulate to its admissibility and the trial court concurs. If any district attorney in this state is not convinced of the reliability of polygraph testing, and not similiarly convinced of the qualifications of the examiner named to do the testing, there will be and can be no polygraph test results admitted in criminal cases in his county while he is district attorney. All he has to do is to refuse to stipulate to the test being given and the results of the test admitted. If he wants the door locked, he can lock it.

What is further puzzling is to have the defense counsel concur in suggesting that polygraph test results, even when requested by the defendant and stipulated to by the parties, ought not be admissible in this state. This is the same defense attorney who petitioned the court that a polygraphic examination of his client be conducted and who named the examiner who was to conduct the test. There would have been no polygraph testing in this

case if the defendant had not specifically sought the testing. There also could have been no polygraph test results here admitted if the defendant and his counsel had not joined in a stipulation both for the testing and the admissibility of the test results. Both prosecutor and defendant had to unlock the door before it could be opened. Thus, in the case before us, both the district attorney and defendant by counsel stipulated that a polygraph test be given by a named examiner with the result of such test to be admitted "subject to the holding in *State v. Stanislawski.*" Neither party in this action has reason to complain about the trial court doing exactly what both parties stipulated the court was to do.

The writer, joined by JJ. LEO B. HANLEY and CONNOR T. HANSEN, would affirm the conviction of this defendant, James Ray Mendoza, on two counts of first-degree murder, to wit: (1) The intentional killing of Police Officer Robert Riley; and (2) the intentional killing of Police Officer Thomas Matulis. We would hold that (1) self-defense was not here applicable; (2) the place of trial was properly moved, and (3) the court rulings as to polygraph evidence, pursuant to *State v. Stanislawski,* were entirely proper.

CONNOR T. HANSEN, J. *(dissenting).* I concur with the dissent of Mr. Justice ROBERT W. HANSEN to the extent that these convictions should be affirmed. I am in agreement with his opinion on the issues of change of venue and refusal to submit a verdict of manslaughter, unreasonable use of force.

In a number of cases, we have held that a trial judge must *sua sponte* exercise his judicial discretion to the end that a defendant receives a trial by an impartial jury. Now we have a case that stands for the proposition that if a trial judge is overly diligent in the exercise of that responsibility it is grounds for reversible error.

Of particular concern is the holding of the majority that refusal to submit a verdict of manslaughter, unreasonable use of force, is reversible error. Sec. 939.48 (1), Stats., self-defense provides in part: ". . . He [the actor] may not intentionally use force which is intended or likely to cause death or great bodily harm unless he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself."

In the case before us, the defendant received a two-millimeter-long cut on the head, described by his own medical witness as "very superficial," while he was engaged with the two officers during their attempted arrest. In *State v. Bronston*, 7 Wis.2d 627, 97 N.W.2d 504, 98 N.W.2d 468 (1959),[1] a woman storekeeper was struck on the head with a rachet wrench during a robbery. She received a two inch laceration of the scalp as a result of the blow which required four sutures to close, was hospitalized a few hours, and had residual pain for a period of time following the incident. We reversed the conviction finding the woman did not sustain "great bodily harm" within the meaning of the sec. 939.22(14), Stats.

Under the facts of the instant case, I cannot reach the conclusion that the failure to submit the manslaughter verdict was error. The officers knew the defendant had a weapon which he discharged in a residential area, and he had threatened to kill them. They were in immediate pursuit to make a lawful arrest. When the officers finally cornered him between some cars, he was still armed. He claims to have protested the treatment he received while the officers were making the arrest. The fact is that by the testimony of his own medical witness, he received but a superficial cut on the head. While the officers were endeavoring to make the arrest, the defendant dropped his weapon to the ground and ultimately

---

[1] *See:* La Barge v. State, 74 Wis.2d 327, 246 N.W.2d 794 (1976).

disarmed Officer Riley. It was because of the forbearance of the officer, prior to being disarmed, that the defendant was able to shoot and kill them both, shooting one of them once, the other twice.

Under the facts of this case, I see no justification for submission of a manslaughter verdict.

The majority of the court also looks upon this case as an opportunity to enlarge the polygraph rule of evidence set forth in *State v. Stanislawski*, 62 Wis.2d 730, 216 N.W.2d 8 (1974). Briefly stated, it is my understanding that the majority extends *Stanislawski* to provide for a hearing, outside the presence of the jury, on the admissibility of the results of the examination. This hearing is to include among other things the right to call other examiners to challenge the results of the polygraph examination administered by an examiner of their joint selection and whose opinion they had stipulated could be admitted into evidence. If a party can attempt to avoid the consequences of his original stipulation, when the results are unfavorable, by the subsequent calling of expert witnesses, it seems to me, the otherwise workable rule of *Stanislawski* is reduced to a nullity. The otherwise binding stipulation is, in effect, reduced to a conditional stipulation.

The minority of the court would enlarge the *Stanislawski* rule still further by permitting the attempted impeachment of the examiner, selected by stipulated agreement, to take place in open court. If this procedure were to be followed, the practical effect of the *Stanislawski* stipulation would be that the parties had really stipulated that polygraph evidence was admissible at the trial.

I would respectfully submit that the instant case and the complications it presents, afford an opportunity to examine the wisdom of the adoption of the *Stanislawski* rule in the first place. At oral argument, counsel for the

state and the defendant both seriously urged this court to consider withdrawing the rule of *Stanislawski*. This writer would agree that the rule appears to be of questionable evidentiary value. The interest of judicial administration could best be served if we were to hold that the results of such examination were not admissible evidence.

